## HONNETT VS. HONNETT.

*52 Ark 425* DURESS. *Marriage.*

> If one having seduced a woman, marries her through fear of the natural and probable consequences of his crime, it would not, in the absence of force or threats of bodily harm at the time, be such duress as would avoid the marriage.

APPEAL from *Jefferson* Circuit Court in Chancery.

Hon. J. A. WILLIAMS, Circuit Judge.

*H. Carlton* and *Read Fletcher* for appellant.

*Bell* and *N. T. White, Contra,*

EAKIN, J.:

This bill was filed on the 17th of April, 1876, by complainant against her alleged husband, setting up their marriage on the 6th day of the same month, and that afterwards he had treated her continuously with *open insult, contempt, unmerited reproach* and *studied neglect.* That he had *publicly proclaimed her a prostitute,* and used concerning her, other vile epithets, and that her condition had been rendered intolerable. Prayer for divorce, alimony and general relief. There was also a separate petition for an order to restrain the defendant from selling or disposing of his property to defeat alimony, to which petition he responded on the 20th of the same month, denying the marriage, and also his intention to dispose of his property.

Complainant followed her bill on the 9th of May, 1876, with a motion in open court for attorney's fees, and alimony *pendente lite.*

On the 11th of May, defendant filed his answer and cross bill, setting up in substance that by conspiracy and threats, he had been forced to undergo the marriage ceremony, against his own free will, and praying that the marriage might be annulled.

The complainant answered the cross bill on the 12th, denying all conspiracy, force or fraud, and stating that the defendant after having seduced her under promise of marriage, had married her at the urgent request of friends, as a reparation of the evil.   On the 10th of June, the court below ordered defendant to pay her $100 as attorney's fees, and the sum of thirty dollars per month for maintenance, *pendente lite*.

A voluminous mass of testimony was taken, upon which the cause was heard.   The chancellor found that the defendant had never of his own free will, consented to the marriage on the 6th of April; that his apparent consent had been procured by force and threats of violence to his person, such as to put him in fear of his life or great bodily harm; that he never recognized her as his wife, and that the marriage was void. It was so decreed, and the motion for alimony and attorney's fees denied.

Complainant appealed, and an order was made in this court, on the 6th of February, for a further allowance; pending the appeal.

Without detailing the mass of testimony appearing in the transcript, this court finds upon a careful review of the same, the following substantial facts:   That the complainant was a young woman of good character and social position.   That defendant began paying her the usual attentions incident to courtship whilst she was quite a girl, about fifteen or sixteen years of age; that he persisted in them for a course of years so as to monopolize her society, gained her love and confidence, and under promise of marriage violated her chastity.   Early in the year 1876, she became *enciente* from this connection.   It became known to her relatives during the absence of defendant on a trip to New Orleans.

They considered her ruined and abandoned by defendant, and despaired of his return.  She however clung to her confidence, and continually asserted that he intended to return, and do her the only justice which remained in his power.

Meanwhile great excitement prevailed amongst the friends of the families, most of whom seem to be Israelites.  Defendant returned on the 6th of April, and went peaceably and unmolested from the steamboat to his place of business.  He was there called upon by numbers of his friends, who reproached him with his conduct, and by arguments, expostulations, and by threats of a grave character urged him to an immediate marriage.  He requested time to make up his mind. but was told that the matter would not admit of delay.  The only direct threat emanated from the brother in law of complainant, who remarked if he did not marry complainant, he would never marry another woman.  He explains the threat in his deposition to mean, that he would follow him up and disgrace him wherever he went, even if he went to Germany, and that he had been offered money for the purpose.  There is some evidence also that he was told that if he did not marry the woman he would be *lynched*, not by parties present, but by others in the community.

During this pressure and these expostulations, defendant was much moved.  He shed tears and trembled, and seemed sorely perplexed.  He was appealed to by the portraits of his parents which hung in the room to act honorably in this matter, marry the complainant, and make all things right.  He was assured that they might still live happy and respected.  He was very reluctant to consent, but yielding to these influences, whether from fear or from remorse, finally did so ; to the great satisfaction of all concerned.  He went with a friend to the clerk's office to procure his own license, and several hours afterwards came with a friend to the house of complain-

ant's brother in law, where she resided and where the ceremony was duly performed. He remained but a short time afterwards, and left; since that time he has refused to live with her or even visit her, and to justify himself, announced on divers occasions and to different persons, that she was unchaste, and had been guilty of intercourse with other men. Of this he does not offer one *scintilla* of proof, or ground of suspicion, beyond his own declaration. The character of the lady save as to this matter, is established by the most conclusive testimony.

Afterwards, being put upon trial, by some association of which he was a member, for his conduct towards the lady; he announced that he had made her his wife, and that it was no longer the business of the members to enquire into his private affairs. It seems that he was acquitted on these grounds.

Taking the whole testimony, it is impossible for this court to determine the true motives that actuated the defendant in consenting to the marriage. He was certainly under no fear of bodily harm from those around him, who were urging him to it. They offered none and allowed him to go to and fro without hindrance. He might, possibly, have been in general fear of the consequences of his act, from the natural impulses of resentment on the part of her relations, as he well might be; and may have failed in the courage necessary to meet the consequences. He may have feared the frowns of his people, and loss of caste and confidence, or the withdrawal of their aid. He may have been actuated by genuine emotions of remorse induced by the appeal to his parents. Certainly the influences, whatever they were, were irresistible. He consented with the greatest reluctance.

Meanwhile, the complainant took no part in any of the proceedings, nor does she seem to have been aware of them, although she, doubtless, knew her friends were urging the marriage. She

remained passive and trusting until defendant came to the house, and led her from her sick room to be married. His refusal to remain with her, caused great distress to herself and her friends, and this, with the reasons assigned, caused the filing of her bill.

It is difficult to speak with calmness and patience of the conduct of the defendant throughout this affair, towards the helpless victim of his selfish passions. In marrying her he did what he ought to have done, and we prefer, in case of doubt, to attribute his action to the better motives of remorse and a sense of justice. His highest motive would have been to save, in some degree, the character of the confiding woman whom he had ruined—to relieve the shame and anguish of her condition, to give her his name, and his child a legitimate father; and to win back the confidence and friendship of his people.

But if his motives were lower, and he feared the natural and probable consequences of a treachery and a crime, and married to escape them; it would not be such duress as would avoid the marriage in the absence of any force, or direct threat of bodily harm at the time the act was done. It would be shocking to allow one to escape the probable and natural consequences of such an outrage, by a marriage, and then having obtained security, to immolate his victim by repudiation of his act. She, at least, was no party to any fraud or duress.

The Chancellor, we think, erred in his findings from the evidence.

Had there been actual duress, it was a tort, which defendant could waive; and we find him afterwards, when under no other duress than fear of expulsion from an association, owning his marriage as a voluntary act, and claiming immunity under it.

The equity of complainant for a divorce on her part, must rest upon the ground of such indignities to her person as rendered her condition intolerable.

After the decision of this court in the case of *Rose* v. *Rose*, 9 Ark., 507, we cannot hesitate to declare, that without any fault of hers, to abandon his wife on the day of marriage, with declarations indicating a fixed and unalterable determination never to live with her or treat her as a wife, and to add to this insult, the deeper injury of traducing her character, without the shadow of proof, was an indignity calculated to crush to earth any woman of ordinary sensibilities.

We think the Chancellor erred also in denying her the relief prayed in her bill, both as to divorce and alimony.

Reverse the decree, and remand the cause with instructions to dismiss the cross bill, and grant a divorce to complainant, with suitable alimony and attorney's fees, to be ascertained by reference to a Master, or in any other mode the Chancellor may deem most fitting in accordance with equity practice.