The opinion of the court was delivered by
Breaux, J..
Plaintiff sues to recover of the defendants, the sum of fifteen thousand, two hundred and eighty-eight and 37-100 dollars ($15,288.37), with interest, for the storage and drayage of cotton, labor on rejected cotton, extra labor, and use of cotton press yard for account of defendants, at the Louisiana Press, owned and managed by the petitioners. A detailed statement of the claim is of record.
With their pleadings, plaintiffs filed a contract entered into with the defendants for the storage and drayage of defendants’ cotton from the 1st of September, 1890, to the 31st of August, 1891.
Defendants, on the other hand, plead the general denial, and, in addition, aver that this written contract was signed by them under duress; that they, being cotton factors and cojnmission merchants, ha'd always, for many years prior to 1890, stored their cotton with plaintiffs at the following rates: Twenty-five cents per bale for drayage, storage and labor for twelve months, or any part thereof; fifteen cents per bale for rejections, out and back (no charges for extra storage); fifty cents per bale for compressing, and fifteen cents per bale for out drayage. Defendants allege, that plaintiffs, for the years 1890 and 1891, came to an agreement with them (the defendants), whereby they bound *1651 themselves to store their (defendants’) cotton, for seventeen and a half cents a bale, and to render other services for an amount acceptable to them, and which they agreed to pay; that early in the month of September, 1890,; the information came to them that all of the cotton presses in the city were about to enter into a combination in order to increase the charges for drayage, storage and compressing; that plaintiffs had agreed, in order to guard against this, to become the lessees of the Orescent City Press for their general business and to turn over their (plaintiffs’) Louisiana Press to them (defendants); that they (plaintiffs) in this, as well as in other respects, failed to carry out their agreement.
Defendants further aver that on September 11th, 1898, they informed one of the plaintiffs, Mathers, that two of the compresses, the New Orleans and Commercial, would not enter the alleged combine which they had heard had been formed, and that, as some -of the other presses were charging buyers the rates charged the year previous for compressing and out drayage, they, the defendants, would be losers, if buyers from their firm were compelled to pay higher for that service; that they, plaintiffs, had not rented the Orescent Press, as was agreed, in order not to be compelled to pay more than in previous years; that, upon this, Mathers assured them, the defendants, that he would comply with his contract; that he had failed to get control of the Orescent Oity Press, but that he would rent some other press. Yet, for reasons defendants aver are shown by the evidence, plaintiffs refused to write and sign their agreement, and when the defendants urged upon them that they should carry out their agreement, plaintiff refused.
Defendants charge that plaintiffs, instead of carrying out, in good faith, their agreement as mentioned above, entered into an agreement with the labor organizations and pressmen which could only result in overcharging them. Plaintiffs, in turn, informed the defendants that they could place their business wherever they chose. This, defendants aver, they did, and placed their business with 'another press at a storage charge of seventeen and a half cents per bale. They also aver, that, afterwards, plaintiffs, by force of their combinations with different associations, connected with the sale and handling of cotton, compelled them, defendants, to leave the press with whidh they had contracted. Defendants aver that the following is the rate of charges agreed upon with the International Press, with which the defendants had entered *1652 into a contract to store and compress their cotton: “Drayage from boat or railroad, and labor and storage for any time less than a year, twenty-five cents per bale; rejections, fifteen cents per bale. The above charges are based on the compressing not to exceed fifty cents per bale and out drayage fifteen cents per bale, but in case the International Press, or M. Levy & Sons, shall deem it to their interest to increase the charge of compressing, or out drayage, then whatever increase is made, storage shall be proportionately lowered.”
Defendants prayed for a reduction of plaintiffs’ demand to $4148.81, and for judgment in reconvention for the sum of fifteen thousand, two hundred and forty-nine 69-100 dollars.
On these pleadings the parties went to trial, and,.after some progress had been made in the trial, plaintiffs and defendants entered into an agreement to submit ajl questions between them, except the question of the validity of the contract and the rate of charges, to arbitrators, who were to have all the power of amicable compounders. With this consent of the plaintiffs and defendants, the court appointed a board of judicial arbitrators. After this board had been organized, they heard the evidence which had been presented to them by plaintiffs and defendants. After having devoted several months to the hearing of evidence, they agreed upon an award which was returned to the court. The homologation of this award was opposed upon different grounds. These grounds are, substantially, as follows: That the Board of Arbitrators refused to permit counsel for the plaintiffs to appear before them; that they refused to have the witnesses sworn; that the umpire took part in the proceedings and controlled them; that the Board of Arbitration took testimony of witnesses without previously notifying the defendants; that it, the Board, excluded the plaintiffs from the room while they were examining the witnesses; that the arbitrator, appointed by the court at the instance of the defendants, and the umpire, took testimony on matters submitted to them in the absence of the other arbitrator; and that one of the arbitrators appointed by the court declared himself as being the representative of the defendants. A rule was filed by the defendants to have the award of the arbitrators homologated. It was in answer to this rule that the just recited grounds of exception or opposition were filed by plaintiffs. The court heard the application on the rule, also the exception and opposition of the plaintiffs to the rule, and approved the award of the Board of Arbitrators.
*1653 The facts connected with the actions and deliberations of' the Board of Arbitration are that the witnesses were not sworn; that one of the arbitrators, while excitedly engaged in a discussion, said that he represented the defendants; that the attorneys of both sides were excluded, the arbitrators thinking that the issues being of fact no arguments of counsel would be needed; that if questions of law arose they would send for the attorneys and hear them; that on one point they were sent for and the point was argued; that the parties were excluded from the immediate presence of the Board, for the reason that disturbance arose between them, but their clerks remained and the parties themselves were heard. It also appears that, plaintiffs, after settling with the defendants some point of difference in their business, after all the asserted grounds of complaint had taken place, submitted them to the Board and authorized them to embody the settlement in their return. The plaintiffs also consented to extend the time within which the Board should continue its session, and this some time after all the irregularities complained of had taken place.
The foregoing statement of the salient facts, arising from the irregularities which took place during the early part of the Board’s proceeding, is complete enough to enable us to decide the question presented regarding the Board’s action.
This brings us to a review of the facts on the merits of the case.
Differences between the parties arose after the agreement for storing the cotton for 1890 and 1891 had been made. They began when the pressmen, owners of the compresses, agreed among themselves to rent a number of cotton presses in addition to those they already controlled, and, in that ¡manner, brought about an increase in the old tariff of charges. It appears that the labor organizations make regulations from time to time, for their government, and they notified the pressmen of their charges. They had agreed, for the year 1890, not to handle any cotton from one press to another, that is, not to permit “cannonading.” We are informed that cannonading cotton is the removal of it by the factor, after it has been stored in one press, to another press for compressing. This “cannonading,” it is said, is injurious to the labor organizations, and the pressmen are also interested in its prevention. The laborers are employed at each press by the year, but they are paid by the bale, and the object, as relates to the laborer, is to enable him to get remuneration when they make the contract for the year. This *1654 involves the necessity, it seems of preventing cotton from being removed from one press to another, or from being removed at all, thereby depriving , as is testified, the laborers employed in one press from earning the wages by not handling the cotton in that press. They, in the first place, had adopted a scale of charges. After the labor organizations had adopted their tariff, the pressmen also agreed among themselves to increase their tariff of charges from fifty cents perl bale for compressing to thirteen cents per hundred pounds, averaging sixty-five cents per bale. Afterward there were agreements entered into regarding the rates which it is contended embraced within their terms the different interests of the laborers and the pressmen, and in which the factors also joined, to the extent that they were concerned in the charges. This increase in the tariff of charges, of both the laborer and the pressman, created some flurry among the buyers of cotton whose interests were directly affected thereby. The buyers sought to make the pressmen return to the old tariff of charges by making it known that they would not buy cotton from factors who did not refuse to place their cotton with those presses that were charging under.the new tariff entered into under the general agreement. For, despite the agreement entered into, it seemed that there were factors who were yet able to offer some reduction in matter of these charges. This flurry among the buyers caused the factors to call a meeting of their association, a body composed of cotton factors. They appointed a committee to meet the pressmen, and the factors agreed with them as to the rates of charges which were accepted by all concerned, except the defendants. The rates agreed upon by all interested, except defendants, were thirty cents for storage, fifty cents for compressing and twenty cents for out drayage. A few days after, one of the plaintiffs and one of the defendants met and this plaintiff said that he would adhere to the new tariff just referred to, and from that time on the plaintiffs insisted that the agreement was not as contended by defendant.
With reference to this agredment, that is the verbal agreement between plaintiffs and defendants, to handle and compress the latter’s cotton, the evidence discloses that several meetings were held in the fall of 1890. At first plaintiffs were concerned about defendants’ business at their press. They, in order to retain it, offered some advantages to the defendants, which the latter, it seems, accepted. There is evidence showing that when defendants requested that the agreement between *1655 them be written, as had always been done the years previous, plaintiffs declined, giving as a reason that they would certainly carry out their agreement.
Defendants acted upon the terms of their verbal agreement with the plaintiffs until the nineteenth of September, when plaintiffs, Bryant & Mathers, wrote to them, defendants, that it had come to their knowledge that they, defendants, were selling cotton with the understanding that the press charges would not exceed fifty cents per bale for compressing, and fifteen cents for cut drayage, and that their press was paying the difference. Plaintiffs notified the defendants that they would not hold themselves bound by these charges; that their compact with the defendants was for storage. Whereupon, one of the plaintiffs called upon defendants at their office and expressly declined to be governed by any contract. Pie then said to the defendants that they were at liberty to place their cotton with any other press. At the same time he left a proposition in writing with the defendants, based on tariff charges, should the defendants desire to continue their business with them and gave them until the first of October, 1890, within which to accept or reject it.
The defendants having been relieved from any further obligation to the plaintiffs on their verbal contract to place their cotton at the latter’s press, and being unwilling to accept plaintiffs’ offer of rates, based on the rates of the executive committee of the Factor’s Association, to which we have before referred, entered into an agreement with the International Press, which had withdrawn from the agreement entered into between .the different presses, to handle their cotton.
After the defendants had made this agreement with the International Press, that is, on the twenty-ninth of September, they notified Bryant & Mathers that they declined to accept their offer under the new tariff, and that they had contracted with the International Press, and that they had issued orders accordingly to all carriers having cotton for them to deliver it to the International Press. The testimony of defendants sustains their allegations that, on the following thirtieth of September, steps were taken to hinder them from making the usual disposition of cotton consigned to them; that when their cotton commenced to be hauled from the steamboats and railroads into the International Press, they were made aware that the laborers positively refused to handle it, and the men who arranged the cotton in the yard refused *1656 to touch it, so that their sampling employees could not sample it, and their business at the press was brought to a standstill; that defendants aver “there was no place, press, warehouse or yard, to which they could transfer their cotton from the International Press where it could be compressed and delivered in the manner usual in the cotton business”; that “they were all connected in such a way that defendant could not do business with any of them, and this, at a time when they had nine hundred thousand dollars loaned out to cotton producers, and when-money was, owing to the condition of the cotton market, not to be borrowed”; that they had no means of disposing of their cotton after the laborers in the International Press refused to handle it; that, if that condition had continued, ruin and disaster were inevitable.
The president of one of the labor organizations testified that they had resolved not to handle any cotton for the International Press, nor for the defendants. After the labor organizations had refused to allow the handling of defendants’ cotton, this officer and an officer of another labor organization called on defendants to induce them not to move any cotton they had at the Louisiana Press, owned or controlled by the plaintiffs. They read an agreement to the defendants regarding the refusal of the laborers to handle cotton, save at tariff rates. This officer testified further that the defendants said to them that they were hauling their cotton to the International Press, and that it was billed to go to the Louisiana Press. The agreement in question was one which bound the laborers not to handle the cotton in the international Press, and “that agreement was a written agreement you submitted to him between the labor organizations and the cotton pressmen.” (Quotation from the testimony of the witness, the officer just referred to). The testimony discloses that the union laborers said to the defendants that if they obtained the consent of Bryant & Mathers, plaintiffs, that they would then move the cotton and handle it for defendants. Whereupon defendants applied to Bryant & Mathers who refused to give their consent. It was a few days after this that defendants concluded that they would sign the agreement with plaintiffs covering the new rates of charges.
The contention of defendants at this point is that in view of the ruin staring them in the face, they were coerced, and, thereby, compelled to accede to the plaintiffs’ terms, as set forth in the proposition to which we have already alluded. It appears from the testimony of record that, at *1657 that time, business was strained, owing' to the condition of the money market; that the financial difficulties began to be felt in the summer, and reached the highest point in December, 1890; that they originated from the great depreciation of values in Central America, and in other places, which caused London financiers to throw their stocks on the market here; that large banking houses failed, and that any cotton factor who was unable on October 1st, 1890, to store and handle his cotton would certainly have failed, in view of the financial situation at that time.
We bring our review of the facts to a close. Those above noted, and those to which we may refer hereafter in the course of our opinion, are sufficient upon which to base our conclusions. It is enough to say, at this time, that the preponderance of evidence shows that defendants could not do otherwise than they did and save their business, that is, accept the proposition of plaintiffs which they had, at first, assumed they were at liberty to decline.
Uhe judge of the District Court rendered judgment in favor of plaintiffs, Bryant & Mathers, on their principal demand for four thousand, three hundred and sixty-six 81-100 dollars, with legal interest from March 1st, 1891. On the reconventional demand there was judgment in favor of defendants, M. Levy & Sons, for the sum of eight thousand, four hundred and seventy-seven 70-100 dollars, with legal interest on six thousand, five hundred dollars, from August 31st, 1891, as fixed by agreement of the parties, and like interest on one thousand, nine hundred and seventy-seven 70-100 dollars thereof, from December 22nd, 1892, until paid, and all costs appertaining to the reconventional demand, including the sum of fifteen hundred dollars awarded to the arbitrators and the umpire asked as their fees here.
From this judgment, plaintiffs prosecute this appeal.
We take up for decision, in the first place, the questions 'arising on the opposition and exception of Bryant & Mathers to the homologation of the award of the Board of Arbitrators.
The exclusion of attorneys who represented the plaintiffs was one of the first rulings of the Board to which the plaintiffs excepted at the time defendants’ petition for the homologation of the award was heard. On this point we find that the plaintiffs acquiesced by their conduct. During the many days and weeks thel Board held its sessions, the witnesses were examined, documents and papers were offered in evidence, *1658 and not the least objection was raised by the plaintiffs on the ground that their attorneys had been excluded. Having remained silent, not the least complaint having been made to the court on that ground, and having taken the chances of an award in their favor, they were estopped by their conduct.
When the parties agreed to submit the controversy between them to judicial arbitrators, the suit remained in court, and continued under its control. The Board's denial of a right could have been remedied by timely objection before the court. No discrimination was shown. The order of exclusion of attorneys, included the attorneys of all parties concerned. Moreover, plaintiffs; chose to keep the Board alive by prolonging the time within which they had to make their award. The expiration of the time limit, without the agreement to prolong its session, would have put an end not only to the irregularities complained of, but to the Board itself. In addition, some time after the Board had adopted the order excluding the attorneys, plaintiffs, in writing, agreed to an indebtedness to defendants of a large sum of money: more than six thousand dollars, and, at the instance of each of the parties, it was included as part of the award of amount due defendants.
To. turn hack and undo all that had been done because the attorneys were not permitted to take part in the proceedings as attorneys, although each of the parties did all he could do to obtain a judgment on the proceedings conducted as they we're conducted, would neither he economical nor judicious. Many days were taken eup by the Board of Arbitration in considering the differences between these parties and in reaching a conclusion, besides a large amount of costs were incurred. All these were considerations which should have influenced plaintiffs to object seasonably to the order excluding the attorneys. Not having objected in time, it is now too late to complain of this order.
This brings us to the next ground upon which plaintiffs object to the award, viz: — the failure of the arbitrators to have the witnesses sworn. The record does not disclose that any one asked to have the witnesses sworn. The parties were present when the witnesses were examined and urged no objection. The authority of arbitrators, as relates to witnesses, is not great. They have no authority of themselves to compel witnesses to appear before them and afchninister to them the oath. O. C. C. 3082. But an order of court can be procured compelling them to appear. The necessity of having an officer present to admin *1659 ister the oath, was, doubtless, the cause of the omission. The formality of swearing' the witnesses may well be waived by the parties, either lacticly or expressly. It is frequently waived in courts of justice. Here the plaintiffs permitted their own witness to be examined without intimating that they had not been sworn. It is not concluded that the failure to swear the witnesses resulted injuriously to them, plaintiffs. Most of the testimony consisted of books and accounts, and the testimony of witnesses regarding charges made in them. It is not contended that injury to plaintiffs was the result. We have nowhere found, from the evidence, that the least wrong- was intended, or that plaintiffs were prejudiced by the failure to have witnesses sworn. Plaintiffs could have protested and refused to go on with the case, a Xuotest that, at that time, would surely have received the! attention of the. court. Having failed to object, they are bound, although the witnesses were not put under oath.
In our statement of the facts attending the proceedings of the Board of Arbitrators, we noted that the parties (plaintiffs and defendants) were excluded, and were not allowed to remain in the room near the arbitrators while the witnesses were being interrogated. Reason enough is given for excluding them, as it was necessary so to do in order to enable Ijhem, the arbitrators, to continue with the duties devolving upon them. There was no protest made at the time. We have not discovered that plaintiffs were prejudiced by the order excluding the parties.
Plaintiffs urge that one of the arbitrators became an advocate of the defendants and lost sight of the impartial duty of an arbitrator. Beyond a hasty expression of this arbitrator, the evidence does not disclose any impropriety on his part.
The proceedings of the Board took up considerable time; they appear to have heard all of the issues presented; when they were in doubt regarding a point of law before them as arbitrators, they sent for the attorneys representing the respective parties and gave them attentive consideration. After their patient and continuous hearing of the numerous issues, we take it that we should not set aside the award because of the hasty and indiscreet utterances of one of the arbitrators, to which not the least objection was offered at thei time, and which does not appear to have had any bearing on the conclusions arrived at. We have not discovered that in disposing of the many vexatious issues pre *1660 sented, any one of the members of the Board was not careful and painstaking. They did all they could in the premises and their work shows a desire to do justice between the parties.
On the 22nd of September, the arbitrators, and the umpire filled their award in court. The arbitrators, 'McGrath and Lippman, found that eight thousand, three hundred and fifty-eight 75-100 dollars was due to the defendants, “of this amount six thousand, five hundred dollars bear interest at legal rate from August 31st, 1891, as per written agreement attached,” of which the following is a copy:
“New Orleans, La., Aug. 25, 1897.
“We have mutually agreed upon sixty-five hundred dollars under date August, 1891, as awarded by you to M. Levy & Sons in settlement of damaged and condemned cotton as per exhibit.”
“(Signed) Bryant & Mathers.
“M. Levy & Sons.
“Approved:
“L. Lippman.
“A. A. Woods.
“P. McGrath.”
The evidence discloses that the arbitrators disagreed as to the amount of one thousand, five hundred and forty-one 72-100 dollars. The umpire decided for defendants. They also disagreed as to a conditional award of one hundred and ninety-two dollars. The umpire also awarded this amount to the defendants.
We have given this subject our most careful attention and have concluded that the award was properly homologated, and that none of the grounds presented were sufficient to justify the court in setting it aside. This award and the judgment of the District Court approving it, and our own, by which the approval is affirmed, decides all the issues, save those arising from defendants’ attack upon the validity of the contract which plaintiffs handed to defendants on September 1st, 1890, to be signed, and which the latter signed a month afterward.
The attack upon the contract being direct by way of reconvention, it may he heard at this time. There is no necessity of compelling the parties to resort to a direct action, as the questions presented may be disposed of in an action to compel the defendants to pay an amount claimed as due on the contract.
*1661 Contracts may be decreed void on exception to the suits brought for their enforcement. The parties are plaintiffs in reconvention suing to have the contract avoided, and present a direct issue for its avoidance. O. C. 1882.
The validity of the contract vel non is the only remaining issue, and this involves the necessity of determining whether defendants were unlawfully compelled to sign the contract and whether they afterwards acquiesced in the contract to an extent that now renders it impossible for them to raise the question of duress.
Plaintiffs having refused to carry out their contract by parol, the original contract, it only remained for defendants to seek elsewhere for some one to handle their cotton, to store and compress, both being indispensible to the carrying on of their business as factors.
After defendants had been notified that plaintiffs did not propose to hold themselves bound by their verbal contract, which was unquestionably binding upon them, to receive and store their cotton, defendants made no objection, and plaintiffs are entitled to all advantage which this consent of defendants affords. They, defendants, accepted the situation and looked around for another press to take charge of their cotton.
When confronted with plaintiffs’ determination not to abide by their verbal contract, the large interests of defendants, in all probability, did not permit them to stand on their rights and compel performance, or require an equivalent in damages. They found a pressman who was willing to contract -with them and did contract on a scale of charges for storage, drayage and compressing, which was acceptable to the defendants. They, defendants, were met by an opposition, which they could not overcome. The parties to it were quite determined. We gather from the evidence that the continued antagonism of the defendants would have resulted in serious trouble. They sought plaintiffs’ consent to that which they had been told they could get (as they were informed by the laborers, through their agent, that that was necessary), but plaintiffs declined to consent at all. They had only one thing to do, and that was to accept the contract which plaintiff offered them to be accepted, and which had to be accepted or rejected within the limited time. Had they refused to sign this contract, the evidence shows that financial ruin would have been the inevitable result. Their cotton would have remained at the different steamboat landings and railroad *1662 stations of the city with not one hand to remove it. That would necessarily have -brought on the wreck of their large business. It exposed their financial standing as merchants to complete extinction. These circumstances were sufficient to wrest from defendants a (consent which they did not wish to give. They were placed in a position where they must sign or perish financially. But it is claimed by the plaintiffs that the action of the labor organizations and the pressmen was in the exercise of their lawful right, and the contract sued upon can not be invalidated in consequence.
Plaintiffs argue' that the combination of artisans for their common benefit for the purpose of raising the price of labor is valid, provided no force or other unlawful means be employed to carry out its ends; and, in support of their position, cite several well considered decisions, in which it is held that one is free to invest his money as he sees fit, and that the same is true of every laborer. We agree in the view that he has the right to his own labor without annoying restraints and in complete freedom, and that the artisans and other workmen may determine for themselves regarding their own actions and their earnings, and may, as they choose, see to their advantage. Greenwood on Public Policy, 650; Com. vs. Hunt, 4 Met. Mass., 111.
But the combined effect of the agreement here,went further than is sanctioned by the view expressed by the commentators and above cited decision, which are entirely favorable to the ¡promotion and advancement of workmen in their trades and occupations. Masters may choose to; suspend operations and laborers may refuse to work for the price offered. This is a right which no one can easily question. But the law steps in when the master and laborer, or either of them, step beyond the bounds and adopt regulations which may be in restraint of trade or commerce.
We are dealing with the interests of pressmen and factors and no question regarding labor or labor unions arises. No difference arose in 1890 and 1891, between labor or capital. Instead of being divided, they were entirely in accord. There were associations of cotton handlers, of factors, of pressmen, and others, all separate, but) all a'cting together in matter of tariff charges. The only dissenters were the defendants, and even they were members of the Cotton Factors’ Association, but they had chosen, from the first, to disagree with the action of the association *1663 and had refused to pay the tariff charges. They invoke Statute No. 66 of 1890 upon the subject.
We pass to the business of warehousemen, as usually considered; as it gives rise to one of the questions at issue in the case. Plaintiffs contend that it is strictly juris privati and not one in which the public can have the least concern. In these warehouses, the cotton hale is put into proper shape to be forwarded to foreign markets. The goods are received from the carrier; compressed and delivered to another carrier to be carried to a foreign port or ¡place, and so it, the warehouse business, enters into the carrying system of the country. This system affords valuable assistance to trade and is beneficial to the producer as well as to the consumer. The ownership is private, but the use is, we believe, public. It is true that the warehouseman may charge the price he wants or refuse to do the work at any price, but we nowhere find, however, the least sanction [which enables him to gauge his price on agreements that must operate in restraint ofl trade and, in consequence, violative of a 'fundamental principle of the law. They, as warehouse-men, are held to compliance with the laws favorable to the moving of freight, and consequent activity of commerce. At any rate, when the evidence shows that nothing was left, save great loss or acceptance of the agreement for storage and drayage on the part of the customer, nothing remains in ;case of defense on that ground but the enforcement of the article of the Code, which reads, in part, that one placed in fear “of great injury to person, reputation or fortune, is entitled to relief from his contracts” as entered into under the circumstances here. Article 1851, O. C.
This brings us to a consideration of plaintiff’s proposition that the contract was ratified by the execution of it without objection or complaint on the part of the defendants. The testimony does not impress us, as showing that the defendants executed the agreement, as plaintiffs aver in their argument. On the contrary, they seem to have withheld payments so as to sustain the plea that they had been compelled to sign. To the extent that they contend that they were coerced, they withheld payments which plaintiffs now seek to recover.
•During the year for which they contracted, their business remained with the plaintiffs. The causes which compelled them to remain with the plaintiffs were as controlling on the first day of the year as they were on the last. During the whole time, the agreement controlling the *1664 rates was in full force and effect and offered no opportunity of escape therefrom. If it be conceded that the plaintiffs were not actively parties to the different agreements regarding the tariff of charges, the case as relates to the question of “duress” would still fall within the grasp of Article 1852, C. C., though it, “duress,” was not brought to bear by those in whose favor the contract was made.
This court, in several decisions regarding a similar question, held that ratification will not be readily inferred, especially when there is good reason for holding that the contrary was the intention. Copelin vs. Menkie, 17 La., 293; citing Toullier, 705, 507; Story Equity Jurisprudence, p. 307; Pothiers’ Traite des Obligations, p. 20, No. 21; 13 La., 172.
Having arrived at this conclusion, we are thereby brought to the conclusion of ¡the amount that should be allowed. We have seen that the defendants, under the circumstances heretofore stated, 'abandoned the old contract. The one with the International Press, which they were not permitted to execute, because of the force of opposing agreements, is that which ifiaintiffs oppose as a proper basis. It was taken by the district judge as controlling under the particular circumstances of this case. We do not think that we should take the tariff of charges agreed upon by the defendants with the International Press as the basis. There were no contractual relations between the plaintiffs and this press, and, therefore, plaintiffs can not be held for any contract price. Les conventions ne p.euvent avoir d’effet \quentre les parties coniractantes. Oeuvres de Pothier, Vol. 1, p. 33. The question is one of value, and defendants are entitled to some reduction (on plaintiffs’ claim) unquestionably, but this is dependent upon the value of the services. We have given our attention to all the evidence upon the subject, the charges made for the services in prior years and the amount at which the plaintiffs offered to renew the contract, or rather to render similar services for the year after the season of 1890 and 1891. But we think that plaintiffs are entitled to an increase over the judgment of the District Court.
Compensation op the Arbitrators and Umpire.
They appeal from a judgment of the Civil District Court awarding fifteen hundred dollars to the two arbitrators and one umpire for their services. They claim a much larger amount. It is true that they *1665 rendered important services; that their labors were protracted and required patience and diligence; that they discharged their duties conscientiously and properly, but, none the less, we do not see our way clear to increase the amount of the judgment in their favor.
The learned judge of the District Court said, regarding this compensation, in his reasons for fixing it as above stated, “I have referred to personal troubles of the parties before them which made their labors unpleasant, at times. It is to their credit and does ¡not diminish the value of their services that they lent their friendly offices to bring the parties together for a compromise, and that a compromise for sixty-five hundred dollars resulted.” These and other expressions of regard we find in the opinion which, we doubt not, are well deserved, but these expressions have not convinced us that the amount of the fee allowed them should be increased. It is unfortunate that they should have given so much of their time to the discharge of their duties as arbitrators, but the issues upon which they passed and the amount involved would not justify us in increasing the fee.
After diligently searching, we have not found a direct and accurate statement of the number of bales of cotton handled by plaintiffs for the defendants during the season of 1890 and 1891. Eor that reason we remand the case only as relates to the item of increase in our decree over the amount allowed in the District Court.
It is therefore adjudged, ordered, and decreed that the judgment recovered by plaintiffs upon their demand being four thousand, three hundred and sixty-six 81-100 dollars, be increased so as to make the sum per bale (for all charges) five cents in excess of the sum per bale decreed in the judgment appealed from, that is, that seven and one-half cents be taken as a basis instead of twelve and one-half cents, and in all other respects the judgments appealed from are affirmed. Costs of appeal are to be paid by the appellees.
Rehearing refused.