MONROE, J.
Plaintiff has appealed from a judgment rejecting his demand that the marriage between him and defendant be annulled for want of consent on his part. The defense is a general denial and plea of estoppel by ratification.
But three witnesses were examined, all of them called by plaintiff; the first being the father of defendant, placed on the stand as a matter of necessity, the' other two being the brother and sister-in-law of plaintiff.
T. J. Williamson, defendant’s father, testified that he went into a field where plaintiff was plowing, and told plaintiff that he must marry defendant, or he would kill him; that he refused to allow plaintiff to go to his home for a change of clothing, lest he should fail to return; that he accompanied plaintiff and defendant to Homer (the parish seat), applied, and paid, for the marriage license, and after the marriage (which he did not actually witness) returned with the parties to his home, where plaintiff spent the night in the same room with defendant, but that he left the next day, and returned to his mother’s house which was his home. He was asked whether he had not armed himself before going into the field, and, the question having been objected to, the objection was sustained.
It otherwise appears that the events above narrated happened on Monday, May 8th, and the morning of Tuesday, May 9, 1911. On the following Friday, May 12th, as plaintiff had not returned, the witness (Williamson) took occasion to speak to Mrs. J. B. Fowler, his (plaintiff’s) sister-in-law, who testifies (in part) as follows upon that subject, to wit:
“He told me when he went to the field where Alvin [plaintiff] was he had to marry her, live with her, and treat her right, or he would kill him; and, then he says, ‘He has not done what he said he would do.’ * * * When I started to leave, he said: ‘I don’t know whether he will come back or not. He can go far, if he wants to. He can run off if he wants to. He may go far or near; but I will get him.’ * * * 1-Ie told me to tell Bud to stop there, * * * that he wanted to talk with him. Q. Who is Bud? A. My husband. * * * Q. Did you tell your husband what he said? A. Yes, sir. * * * Q. Which way did he go? A. He went up the road towards Mr. Williamson’s house. I also saw them standing there in the road, in front of Mr. Williamson’s house.”
J. B. Fowler (brother of plaintiff and husband of the witness whose testimony is above quoted) gave the following, with other, testimony :
“Q. Did you see Mr. Williamson on the Friday evening that your brother went back over therg late that evening? A. Yes, sir. Q. I-Iow come you to go up there? A. My wife said that Mr. Williamson said stop there, he wanted to talk with me. * * * Q. Repeat what Mr. Williamson said to you? * * * A. He said that Alvin had not done what he agreed to do, and said he went to him in the field and gave him a chance for his life, and told him he could either marry or die, and he said he would marry, and he said he hadn’t done it. Q. He said he hadn’t married her? A. Said he hadn’t married her. Q. What did he say? A. Said he hadn’t married her. Q. What else did he say? * * * A. He said he could leave if he wanted to, he might go far or near, but he would get him. Said he was not making him come back. * * * Q. Where did you go after you left Mr. Williamson’s? A. To my mother’s. Q. Did you tell your brother what he had said? A. Yes, sir. Q. Did your brother go back after you told him what Mr. Williamson had said, if you know of your own knowledge? A. Yes, sir.”
Plaintiff did go back to Mr. Williamson’s late that Friday evening, and he remained there for 12 days, during which time he oc *1091 cupied the same room, and, presumably, slept in the same bed, with defendant. He then-went to Shreveport, in search of employment, it is said, and, returning at the end of say six days, again went to Williamson’s house, slept one night with defendant, and left the next morning, to return no more. There is some testimony to the effect that Williamson caused his arrest on a charge of nonsupport of his wife, and thereafter, on July 3, 1911, this suit was instituted. Williamson denies some of the statements attributed to him, but we take his denial as applying rather to form than substance, and, upon the whole, entertain no doubt of the substantial verity of the testimony given by Mr. and Mrs. Fowler.
Opinion.
[1, 2] That plaintiff was coerced by a threat of death as the alternative to enter into the contract which he seeks to annul is beyond dispute, and the defense relied on is that thereafter, at a time when he was a free agent, he voluntarily acted under and ratified said contract. But we do not find that to have been the case. The alleged ratification was clearly the result of the same form of coercion as that which was originally applied, and produced no better result.
“Consent to a contract is void, if it be produced by violence or threats, and the contract is invalid.” C. C. art. 1850. “No marriage is valid to which the parties have not fully consented. Consent is not free * * * when it is extorted by violence.” C. C. art. 91; Bryant & Mathews v. M. Levy & Son, 52 La. Ann. 1649, 28 South. 191; 26 Cyc. 834.
“No contract can be avoided on account of alleged violence or threats, if it has been approved either expressly, after the violence or danger has ceased, or tacitly, by suffering the time limited to elapse without causing it to be rescinded.” Civil Code, art. 1855.
“In order that a marriage obtained through duress may be validated, it is necessary that the ratification be after the duress has ceased to be operative.” 26 Cyc. 866.
“The acts of a party from which the ratification of a contract is sought to be deduced must evince clearly and unequivocally his intention to ratify.” Copeland v. Mickie et al., 17 La. 286; Breaux v. Sarvoie et al., 39 La. Ann. 243, 1 South. 614; Williams v. Pullman Car Co. et al., 40 La. Ann. 93, 3 South. 631, 8 Am. St. Rep. 512; Succession of Easum, 49 La. Ann. 1345, 22 South. 364; Guillebert v. Grenier, 107 La. 618, 32 South. 238; Doucet v. Fenelon, 120 La. 33, 44 South. 908.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be avoided and reversed, and that there now be judgment in favor of the plaintiff decreeing null and of no effect the contract of marriage said to have been entered into between him and the defendant, and here attacked. It is further decreed that defendant pay all costs.