LEE v. LEE.

Opinion delivered March 12, 1928.

1. MARRIAGE—DURESS.—Duress in the procurement of a marriage was shown where the father of the woman who gave birth to a child approached carrying a rifle and said plaintiff would have to give the baby a name, and plaintiff's fears that he would be killed had he not consented to the marriage were well founded.

2. MARRIAGE—EFFECT OF DURESS.—Where plaintiff was approached by the father of the woman who gave birth to a child, and stated that plaintiff would have to give the child a name, and plaintiff's fears that he would be killed had he not consented to a marriage were well founded, the fact that the woman whom he married was not cognizant of the duress was immaterial.

Appeal from Lafayette Chancery Court; *J. Y. Stevens,* Chancellor; affirmed.

*Steve Carrigan, Allen H. Hamiter* and *Edwin Upton,* for appellant.

*Searcy & Searcy,* for appellee.

SMITH, J. Appellant, Ida Moncus Lee, gave birth to a child without being married, and, following its birth, she became delirious, and remained so for several days. Upon recovering consciousness she told her father, R. E. Moncus, that appellee, Fred Lee, was the father of the child. The following day Mr. Moncus took his rifle, and, accompanied by his son, Oce Moncus, drove to the home of Jim McDaniel, who was his brother-in-law and an uncle of appellant. The three drove some miles in an automobile to Lewisville, to a garage where appellee was employed. Upon reaching the garage the three men left the car, and Mr. Moncus, with rifle in hand, walked up to appellee and told him that he had ruined his daughter, who had given birth to a child, and that he would have to go and give the baby a name. Appellee asked Mr. Moncus if his daughter had said that he was the father of the child, and Moncus replied that she had. Appellee then said, "I am ready." No other conversation occurred between the parties, except that McDaniel had been crying, and said to appellee, "God damn you, I will kill you."

R. T. Laster, who is a justice of the peace, testified that he observed that something unusual was happening, and that he went to the garage, and, upon arriving there, he said to Mr. Moncus, "Richard, do not be rash; you have enough trouble," and Moncus answered, "Uncle Bob, I am not going to do any wrong; all I want is for Judge (a nickname by which appellee was known) to give that baby a name."

As the parties got in the car, appellee said that he would like to change his clothes, and he was driven to the house where he roomed. Appellee's nephew, Howard McClendon, was at the McClendon home when the party arrived, and appellee and McDaniel went to appellee's room. Nothing was said while they were there, but McDaniel kept his hand in his bosom until they left. The services of a minister had been secured, without appellee's knowledge or consent, and the minister was waiting at the office of the county clerk when the party arrived there. Appellee procured from the clerk a marriage license, and paid the fee therefor with a check drawn by himself. The party then entered the car, and drove twelve miles to the home of Mr. Moncus. Appellee was placed on the front seat, and Mr. Moncus, with his rifle, sat on the rear seat. When the party arrived at the home of Mr. Moncus, appellee said that he wanted to speak to appellant, and for about five minutes he was in the room with her alone, but during that time Mr. Moncus stood near the door with his rifle. McDaniel and Oce Moncus were present in the house.

Appellee told the minister that he was ready, and the party went into the room where appellant was lying in bed. The minister directed appellee to take appellant's hand, and he did so, and the ceremony began, when the minister observed that appellee had released appellant's hand, and he again told appellee to take her hand. When finally the minister asked appellee if he would take appellant as his wife, there was a perceptible pause, but appellee answered "I will."

The minister testified that he was aware that an unusual ceremony was being performed. He saw Mr. Moncus had his rifle, but no demonstration was made with it. About fifteen minutes after the ceremony, appellee, without having any further conversation with his bride, asked to be carried back to town, and this request was complied with. Appellee did not pay the minister for his services, and was not asked to do so. Appellant testified that she had not seen appellee since the wedding.

Appellee brought this suit for divorce, alleging as ground therefor that he had married appellant under duress, and, in support of that allegation, offered the testimony set out above.

Appellant testified that she knew nothing of any duress, and that she supposed appellee had consented to marry her to right, in part, the wrong done her, as she also testified that appellee had seduced her under a promise of marriage. The granting of the divorce was opposed upon the ground that there had been no duress.

Mr. Moncus testified that all he asked appellee to do was to give the baby a name, and that he had his rifle for the purpose only of defending himself in the event appellee assaulted him.

Mr. McDaniel admitted that he was armed, but he testified that was a deputy sheriff, and had his pistol because he had certain papers to serve, and that he went along to keep the peace. He admitted, however, that he went with appellee to appellee's room, but stated that he did this because he did not know but that appellee would come out with a gun, and he knew there would be bad times if he did so. He admitted cursing appellee at the garage, but said he did this because of his indignation, and that he did not threaten to kill appellee or to do him any violence.

The testimony did not show that either the gun was ever pointed at appellee or that McDaniel ever drew his pistol.

It appears that, when the party entered the automobile, the sheriff was standing by, and it is insisted that,

if appellee was unwilling to marry appellant, he had only to call the sheriff for protection.

A decree was granted appellee, and for the reversal of that decree it is insisted that duress was not shown, and, if so, that appellant was not a party to it.

We think duress was very clearly shown. Appellee testified that he offered no protest, as he feared he would be killed had he done so, and we think his fears were well founded. From the testimony set out above it appears very highly probable that, if there had not been a wedding, there would have been a funeral. It may be true that appellant was not cognizant of the duress. Indeed, her physical condition at the time of the wedding strongly indicates that she was not, but it was not essential that she should have been.

In Nelson on Divorce and Separation, vol. 2, § 622, page 592, it is said:

"It is immaterial from what source the threats emanate, or who is the active instigator of the proceedings at law which constitute the duress. If others have so frightened the complainant that his consent is involuntarily given—'a yielding of his lips, but not of his mind'—the marriage is voidable for want of consent. If the woman was ignorant of the actions of her friends in procuring his consent by duress, this would not render the marriage valid. The lack of consent is vital in all cases of duress, and therefore the complicity of the other party or her ignorance of the duress is immaterial." See also _Marks_ v. _Crume_ (Ky.), 29 S. W. 436.

In the case of _Honnett_ v. _Honnett,_ 33 Ark. 156, 34 Am. Rep. 39, it was held that, if one, having seduced a woman, marries her through fear of the natural and probable consequences of his crime, it would not, in the absence of force or threats of bodily harm at the time, be such duress as would avoid the marriage, and appellant insists that the testimony here shows nothing more; but we do not concur in this contention. We think the testimony very clearly shows such duress as warranted the court below in finding that the marriage was not a vol-

untary act on the part of the appellee, and that there has been no subsequent ratification thereof on his part. *Fowler* v. *Fowler,* 13 Ala. 1088, 60 Sou. 694; *Sheppard* v. *Sheppard,* 174 Ky. 615, 192 S. W. 658; *Marsh* v. *Whittington,* 80 Miss. 400, 40 Sou. 326; Cooley's Tiffany on Domestic Relations (3d ed.), page 13; *Simmons* v. *Stevens,* 132 La. 675, 61 Sou. 734; 1 Bishop on Marriage, Divorce and Separation, § 538, page 231; *Bassett* v. *Bassett,* 9 Bush (Ky.) 696; *Willard* v. *Willard,* 65 Tenn. 297, 32 Am. Rep. 529, 2 Schouler on Marriage, Divorce, Separation and Domestic Relations (6th ed.), § 1149, page 1408; 18 R. C. L., chapter Marriage, § 38.

The decree of the court below is therefore affirmed.