WORTHINGTON *v.* WORTHINGTON.

5-2474                                    352 S. W. 2d 80

Opinion delivered November 27, 1961.

[Rehearing denied January 8, 1962.]

*Willis V. Lewis,* for appellant.

*O. W. Pete Wiggins,* for appellee.

ED. F. MCFADDIN, Associate Justice. This appeal challenges a decree which refused to annul a marriage. Appellant, Paul Worthington, and appellee, Judith Worthington (nee Nahlen), were married in Idabel, Oklahoma, on October 24, 1960. On the day following the marriage, Paul filed this suit for annulment, alleging that the marriage was entered into by him under duress, *i. e.,* threats on his life and the lives of his parents made by the appellee's stepfather, Fred Stratton, who forced Paul to drive to Idabel, Oklahoma, and have the marriage ceremony with appellee, Judith.

The answer denied any duress; and, by cross-complaint, appellee alleged: ''That she is now pregnant by the plaintiff and has been so for more than six months, that her child is due to be born soon, and that she is without funds with which to pay her hospital bills, doctor bills, and other lying-in expense and the plaintiff should be required to pay a reasonable sum to be fixed by this Court . . .'' Trial in the Chancery Court resulted in a decree reading in part as follows: ''The Court finds that the burden of proof was on the plaintiff to prove the allegations of his complaint by clear and

convincing and satisfactory evidence, which he failed to do, and it is therefore the order of the Court that the plaintiff's complaint be and it is hereby dismissed." The plaintiff was required to pay $10.00 per week for defendant's maintenance and also to pay court costs and attorney's fee. From the judgment of the Chancery Court, appellant prosecutes this appeal, urging: "That the evidence produced by the plaintiff and appellant herein was more than sufficient to justify a judgment on behalf of said plaintiff and appellant."

I. *The Applicable Law.* The law of Oklahoma governs as to the annulment of the marriage because it was solemnized in Oklahoma and the parties never lived together in Arkansas. The law of the forum determines the procedure, but the law of the place of the matrimonial contract (Oklahoma) governs the validity of the contract at the place of its execution. *Feingenbaum* v. *Feigenbaum,* 210 Ark. 186, 194 S. W. 2d 1012; Leflar, "Conflict of Laws" § 140; and Leflar, "The Law of Conflict of Laws" § 170. What is the law of Oklahoma? In Oklahoma Statutes, Annotated,[1] Title 12 § 1283, it is stated:

"When either of the parties to a marriage shall be incapable, from want of age or understanding, of contracting such marriage, the same may be declared void by the district court, in an action brought by the incapable party or by the parent or guardian of such party; but the children of such marriage, begotten before the same is annulled, shall be legitimate. Cohabitation after such incapacity ceases shall be a sufficient defense to any such action."[2]

This statute was borrowed by Oklahoma from the General Statutes of Kansas of 1889, par. 4761; and the purpose of quoting this statute is to show that Oklahoma recognizes that marriages may be annulled.

---

[1] Published by the West Publishing Company in 1951.

[2] The Arkansas statutes regarding annulment of marriage are found in § 55-106 *et seq.,* Ark. Stats.

The Oklahoma statute does not specifically mention a marriage contracted under duress, but in the case of *In re Mo-se-che-he's Estate* (1940), 188 Okla. 228, 107 Pac. 2d 999, the Supreme Court of Oklahoma held that a District Court, under its broad equity jurisdiction, had power to annul a marriage entered into while one of the parties thereto was under an inhibition different from any mentioned in the foregoing statute. The Oklahoma Court said that a court of chancery, by virtue of its ordinary equity powers, possesses jurisdiction in a suit brought for the purpose of annulling a marriage, and the Court mentioned a number of grounds in addition to those listed in the foregoing statute.

In 55 C. J. S. 929, "Marriage" § 52, in discussing the general jurisdiction of a court of equity to annul a marriage, cases from many jurisdictions are cited to sustain this text: ". . . where no statutory limitation has been imposed on the jurisdiction of a court having general equity powers to entertain such suits, a court of equity may take jurisdiction of a suit to annul a marriage where the ground alleged is one on which equity gives relief in respect of contracts generally, namely, in the case of fraud, error, duress, mental incapacity, or want of consent generally."

II. *The Quantum Of Evidence Required.* The law of Oklahoma and the law of Arkansas coincide on the necessity of the person seeking to annul the marriage to offer strong, clear, and convincing proof before annulment will be decreed. In *Phillips* v. *Phillips,* 182 Ark. 206, 31 S. W. 2d 134, in discussing the *quantum* of evidence necessary to support a decree for marriage annulment, we quoted from an earlier case:

" 'Every intendment of the law is in favor of matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proof, the law raises a strong presumption of its legality; not only casting the burden of the proof on the party objecting, but requiring him throughout, and in every particular, plainly to make the fact appear, against

the constant pressure of this presumption, that it is illegal and void. So that it cannot be applied like ordinary questions of fact, which are independent of this sort of presumption.' "

The Oklahoma Supreme Court held in *Blunt* v. *Blunt* (1947), 198 Okla. 138, 176 Pac. 2d 471, that the marriage relationship is of such public concern as to require courts to scrutinize actions to annul marriages to discern their probable effect on the public as well as on the individual parties. Likewise, in *Stone* v. *Stone* (1944), 193 Okla. 458, 145 Pac. 2d 212, the Oklahoma Supreme Court held that the evidence in an action to annul a marriage had to be strong and conclusive. The general rule is stated in 55 C.J.S. 938, "Marriage" § 58: "The Courts will not grant a decree of nullity except on the production of clear, satisfactory, and convincing evidence." We have several cases in Arkansas, in each of which marriage annulment was sought on the claim of duress. Some of these cases are *Honnett* v. *Honnett,* 33 Ark. 156, 34 Am. Rep. 39; *Marvin* v. *Marvin,* 52 Ark. 425, 12 S. W. 875, 20 Am. St. Rep. 191; *Lee* v. *Lee,* 176 Ark. 636, 3 S. W. 2d 672; *Kibler* v. *Kibler,* 180 Ark. 1152, 24 S. W. 2d 867; *Phillips* v. *Phillips, supra;* and *Feigenbaum* v. *Feigenbaum, supra.*

III. *The Insufficiency Of The Evidence.* Measuring the evidence herein by the applicable rules heretofore mentioned, we conclude—as did the Chancery Court—that the plaintiff failed to establish his case. Paul Worthington was no novice in matrimonial matters. He had a divorced wife and a child at the time he contracted the marriage here involved. He was twenty-two years of age, and Judith Nahlen was nineteen years of age. To recite all of the evidence would serve no useful purpose. Paul Worthington admitted his intimacies with Judith; and his ardent love letters were introduced in evidence; but he claimed that his ardor cooled when Judith told him—which she vigorously denied—that it was doubtful that he was the father of the child to be born. At all events, Judith returned to Little Rock and called Paul on the night of October 23, 1960, and he went in his car

to see her. Then Paul says the duress began when Judith's stepfather threatened to kill him unless he married the girl. Judith, her mother, and her stepfather drove with Paul in his car to Texarkana to have the marriage ceremony in Texas. Paul says all of this was against his will, and that he went only because Judith's stepfather threatened to kill him, but while Paul was in Texarkana, he was away from the others and called his parents over long distance and could have avoided the marriage if he had so desired. He was away from any alleged duress and could have stayed away. Instead, when it was learned that a waiting period was required before a marriage could be performed in Texas, Paul, Judith, her mother, and the stepfather drove to Idabel, Oklahoma. There Paul again eluded the stepfather and appealed to a police officer for protection. Full protection was given him. The Chief of Police of Idabel, called by Paul to substantiate his story, testified:

"I told the boy he didn't have to marry the girl and that was strictly up to him. I said that I didn't know what the Arkansas Statutes were but that I could tell him what they are in Oklahoma and I said, 'you do as you please, you don't have to marry her.'

Q. And you advised him further it was entirely up to him, you would see that he had safe transportation back?

A. Yes, sir."

While thus under police protection, Paul called his mother in Little Rock, and the Police Chief testified:

"Q. He talked to his mother and after he talked to her he decided he was going ahead with it?

A. Yes, sir, he decided to marry her."

And again the officer testified:

"A. I didn't try to stop it after they agreed to go through with it.

Q. Did he apparently agree to it of his own accord and own will?

A. Yes, sir.''

Paul Worthington claimed that the reason he agreed to the marriage was because Judith's stepfather said that if Paul didn't marry Judith, then the stepfather would come back to Little Rock and kill Paul's parents. This, he claimed, was the real duress. But the evidence is in dispute as to whether this alleged threat of the stepfather was *before* or *after* the telephone conversations that Paul had with his parent, as previously mentioned. Here is what the Police Chief—called by Paul Worthington—testified on this point:

''The Court: I am trying to get from the Chief, if he recalls, but he doesn't recall, which occurred first.

A. I told you a while ago I don't know which one of the conversations came up first, but I did say I believe the conversation over the telephone was first.''

Judith, as well as her mother and her stepfather, strongly dispute Paul's testimony as to all matters of duress; and with Paul's testimony unsupported on the vital matter of duress through threats, we cannot say that the Chancery Decree is against the preponderance of the evidence. There may have been some duress exerted originally by Judith's stepfather, but the evidence seems rather clear that Paul ultimately acquiesced and voluntarily applied for the marriage license and had the wedding ceremony performed by the County Judge at Idabel, Oklahoma; and it was only after he returned to Little Rock and consulted his parents that he decided to claim continuing duress.

The decree of the Chancery Court is affirmed; the appellee is awarded $150.00 additional attorney's fee in this Court; and the Chancery Court has continuing jurisdiction to consider the petition of appellee for maintenance allowance and other expenses for herself and child.