## Shepherd v. Shepherd.

(Decided March 16, 1917.)

### Appeal from Crittenden Circuit Court.

1. Divorce—Judgment—Duress.—A decree granting a divorce because of duress in obtaining the marriage must have the same effect as a judgment annulling the marriage, for the same reason.

2. Marriage—Invalid Marriage—Ratification.—A marriage obtained by force, duress or fraud may be affirmed and ratified by the injured party by the exercise of the marital rights after the constraint has been removed, or the knowledge of the fraud.

3. Marriage—Void Marriage.—A void marriage is one incapable of ratification, and may be treated as a nullity by the guilty and innocent, alike, but to procure a divorce where the marriage was obtained by duress or fraud, or to have such marriage annulled, is a privilege personal to the injured party, and can not be effected by the heirs of such party, nor by any third parties, nor by the party in fault.

4. Divorce—Alimony.—Where a husband obtains a divorce, without the fault of the wife, she is entitled to alimony, and this includes the state of case where the judgment for divorce in favor of the husband was erroneously granted, and where the divorce should have been granted to the wife.

5. Divorce—Threats of Bodily Harm.—Where one seeks a divorce upon the ground that he was induced to consent to the marriage because of threats of bodily harm, although such threats and demonstrations, from which bodily harm might be inferred, were made, they will not be sufficient to entitle him to a divorce, unless it appears that he was influenced by the threats and demon-

strations, and that his will was overcome thereby, and that he consented to the marriage solely from the fear inspired by such threats and demonstrations, and not from other motives.

6. Seduction—Marriage—Presumption.—Where there has been a victim of seduction, the courts of equity should be very slow in running to the relief of the seducer, although the family and friends of the victim have brought pressure to bear upon him to repair the wrong done by marrying her. In such state of case, it will be presumed that he entered into the marriage from a sense of moral duty or from remorse, rather than that he was coerced by fear of bodily harm. This presumption should be weighed against the evidence of duress.

7. Divorce—Duress in Obtaining Marriage.—Where there has been antenuptial incontinence between the parties to the marriage, a divorce will not be granted because of duress in obtaining it, unless the facts are such as to clearly and convincingly demonstrate, that the complainant entered into the marriage bonds from duress per minas, and not from other motives.

8. Divorce—Duty of County Attorney to Resist.—It is the duty of the county attorney to resist the granting of all divorces, and he can not contract for or be paid any fee in a divorce case, other than is prescribed by the statute.

J. W. BLUE, JR., and T. C. BENNETT for appellant.

A. C. MOORE for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing in part.

The appellee, Jack Shepherd, being dissatisfied with a marriage, which he entered into with the appellant, Willie Shepherd, on the 28th day of July, 1915, instituted this action for a divorce, alleging as the grounds for the divorce, that the marriage was obtained by duress, *per minas,* imposed upon him by the father of appellant and presumably with her connivance. The ground relied upon is a statutory one, which is provided by one of the provisions of section 2117, Ky. Statutes, which authorizes a court of general jurisdiction to grant a divorce, to the party not in fault, for force, duress or fraud in obtaining the marriage. The action, it will be observed, is not for an annulment of the marriage on account of force or fraud, which is authorized by section 2100, Ky. Statutes. The result of a decree, granting a divorce for force or duress in obtaining the marriage, must, however, have the same effect as a judgment annulling a marriage because of force. A decree granting a divorce because of duress in

obtaining the marriage is a ground which goes directly to the validity of the marriage contract at the time of its consummation by the rites of matrimony. An essential element in the contract of marriage is the agreement and consent of the parties, just as it is an essential element in any other contract. In the absence of the essential element of consent there is no meeting of the minds in agreement, and a judgment, which decrees that the marriage was procured by duress is a determination that the consent of the complaining party was not obtained, and hence the consent to marry did not exist. In Bassett v. Bassett, 9 Bush 697, it was said:

"The common law treats a matrimonial union of this kind, where the injured party has not ratified or affirmed it after all constraint is removed, as void, *ab initio,* and permits its validity to be questioned in any court, at the option of such party, upon the palpable ground that the element of mutual consent, so essential to every contract, is wanting."

It was held in that opinion, however, that such a marriage was *prima facie,* valid, and that the burden of showing that it was obtained by duress or force rested upon the party who complained of it, and the further burden of making out a state of case, which would authorize the conclusion that the marriage had not been ratified by the exercise of any marital rights since the removal of the constraint. It is apparent, however, that a marriage procured by fraud or duress is not absolutely void for all purposes, but it can only be declared so at the option of the injured party, since all of the authorities are to the effect that it may be ratified or affirmed by the injured party by the exercise of marital rights after constraint has been removed. Furthermore, to have such marriage dissolved or declared null is a privilege personal to the injured party, and can not be affected by the heirs of such party, or by any third parties, or by the party in fault. For as said by this court in Tomppert's Ex'tr v. Tomppert, 13 Bush 326, with reference to a marriage alleged to be void because of having been procured by fraud:

"If a marriage procured by fraud is void, the most unjust and absurd consequences would follow. A void marriage is incapable of ratification. It is as if no pretended marriage existed—neither party is bound; the guilty and the innocent are alike at liberty to disre-

gard it. If such a marriage as this is void, the guilty party may set up his or her fraud in order to escape the responsibilities incident to the marriage relation.''

Hence, the injured party in a marriage obtained by duress may waive the wrong and ratify the marriage and make it valid by the exercise of the marital rights after the constraint has been removed. While the law treats the assumption of the marriage relation as a civil contract, it is not treated in all respects as an ordinary contract. In the instant case, the appellant, by her answer, plead that a contract to be married, in the future, existed between her and the appellee, and under promise of marriage he accomplished her seduction and procured her to submit to permitting him to have sexual intercourse with her, the result of which was her impregnation, which resulted in the birth of a child after the marriage, and that the marriage was not procured by duress imposed upon the appellee, but his motive for entering into it was the performance of the obligation which he owed to her. All force and duress alleged in the petition was, also, denied by the answer, and that the appellee had abandoned her and a prayer was made for the dismissal of the petition, and for the recovery of alimony and the expenses of the litigation. The appellee, by his reply, denied any promise of marriage to the appellant, and denied the paternity of the child, and alleged that it was the fruits of her unlawful cohabitation with some other person, but, it is noticeable, that the reply fails to deny that previous to the marriage that the appellee had been guilty of sexual intercourse with the appellant. The chancellor decreed that the appellee was entitled to be granted a divorce on account of the alleged duress imposed upon him in submitting to the performance of the marriage rites, and while it decreed the payment of the ordinary costs of the suit by the appellee, denied to appellant any alimony or the allowance of any attorney's fees for her benefit. While she admits that the judgment granting a divorce from her can not be reversed by this court, she has appealed from that portion of the judgment which denied her the allowance of alimony and attorney's fees, upon the ground that the judgment granting the divorce was erroneous, and that because of the abandonment of her by appellee that she was entitled to have an allowance for alimony and that he be required to

pay a reasonable sum for attorney's fees to enable her to resist the procurement of the divorce.

While the answer of the appellant did not contain any prayer for a separation in the nature of a judgment for a divorce from bed and board, the prayer was for alimony, and an issue having been joined upon the averments of the answer, as was held in Freeman v. Freeman, 11 R. 822, it was in effect a prayer for a decree of separation. It has been held by this court that in all cases where the husband obtains a divorce without the fault of the wife, that she is entitled to alimony, which includes the state of case, where the judgment for divorce was erroneously granted and where the divorce should have been granted to the wife. Lacey v. Lacey, 95 Ky. 110; Steele v. Steele, 27 R. 120; Davis v. Davis, 86 Ky. 32. It was held in Hulett v. Hulett, 80 Ky. 364, that where the facts of the case show that a separation was proper that the chancellor was authorized to require the husband to maintain his wife during the coverture, and that although, where the charge was abandonment, that the statutory period had not expired, which is necessary to support the action, an action might be maintained for alimony by the wife without seeking or being entitled to a divorce, other than from bed and board, and in Butler v. Butler, 4 Lit. 206, this court said:

"The chancellor, before the statute and since, in cases not embraced by it, which have strong moral claims, had and has jurisdiction to decree alimony, leaving the matrimonial chain untouched, and that those authorities which decide in favor of such jurisdiction ought to prevail." The same doctrine was upheld in Lockridge v. Lockridge, 3 Dana 29.

So, the question is presented upon this record as to whether or not the appellee has sustained his cause of action for divorce and if he has failed to do so, then the appellant having been wrongfully abandoned by him would be entitled to have a decree in her favor for alimony and an allowance of a reasonable attorney's fee for her benefit in the action pending.

The sole ground relied upon by the appellee to procure the divorce is duress. It is not alleged in the petition that this duress was exercised by the appellant, or by her procurement or by her connivance. Under the general rule of the common law as applied to the duress

necessary to avoid a marriage, it was necessary that the duress be exercised by the other party to the marriage, or at least that such party was cognizant of the duress, and knew that the complaining party was acting under the fear induced by the duress. But it was held by this court in Marks v. Crume, 29 S. W. 436, that fear inspired by the threats and demonstrations of the relatives of the other party to the marriage, which compelled one to consent to a marriage, was sufficient. In the instant case, the duress relied upon was demonstrations from which the appellee inferred that he was threatened with death or bodily harm, if he did not consent and enter into the marriage. In order, however, to entitle him to have the marriage annulled or divorce granted by reason of such demonstrations, it must appear that his action in consenting to and entering into the marriage was influenced and controlled by the fear inspired by the demonstrations and the fact that threats are made to inflict bodily harm upon a person unless he marries another does not amount to duress where the evidence fails to make it appear that his will was overcome by the threats and that he consented to the marriage solely from the fear inspired by the threats. Although the threats and demonstrations to do bodily harm to one unless he marries another are made, if the subject of them was not influenced by them, to enter into the marriage, but acted from other motives, there is no such duress as would entitle him to have a divorce from the marriage bonds, which he has entered into from other motives. It goes without saying, that if the complainant was mentally incapable of resisting the improper pressure applied, there was no such consent as would support a contract of marriage. In Todd v. Todd, 17 L. R. A. 320, the Supreme Court of Pennsylvania, in a case under a statute similar to ours, in defining the duress necessary to render the marriage voidable, said:

"The threats must be against the life or to do bodily harm, and such as would overpower the judgment and coerce the will, and must be such a mental condition as a result of the threats that the libelant did not and could not consent to the marriage."

In Stevenson v. Stevenson, 7 Phila. 386, defined the duress necessary thus:

"The coercion must be such as to compel the party to act against her will; that there must be actual force by imprisonment and putting in fear or such threats of life or great bodily harm as amount to duress, *per minas.*"

Where there has been a victim of seduction, the courts of equity have been very reluctant to grant relief to the seducer, although the family and friends of the woman have brought pressure to bear upon the seducer to repair the wrong done the woman by marrying her, and although he has entered into the marriage with extreme reluctancy. It would seem, in such a state of case and where it appeared that the party claiming that he had been compelled to a marriage under duress, had done nothing more than in all honor and good conscience he should have done, by marrying the victim of his antenuptial incontinence, that the courts of equity should be very slow in running to his relief. While there has been no case which involved this principle before this court, until the instant one, it can safely be said that the granting of relief to individuals situated in such states of case as above described, is not in hearty accordance with the principles of equity, as ordinarily applied. It would seem that when one enters the household of another under the guise of friendship or matrimonial intentions and debauches the object of his attentions, he is in a poor attitude to stand upon his legal rights and declare that he has never made any agreement to marry, and has had no agreement with the unfortunate victim, except to debauch her, and then to find ready help in a court of equity to relieve him from an obligation which he ought to have assumed without coercion. Such has been the view taken by the courts in other jurisdictions, where it has been held that where an individual has previous to the marriage seduced the other party to the marriage, the courts will rather presume that he entered into the marriage with the victim, from a sense of moral duty, than to hold that he has been coerced, although he consented to the marriage with extreme reluctancy. In the case of Thorne v. Farrar, 135 Am. S. Rep. 995, 57 Wash. 441, an attorney and police officer called upon the man and represented to him that the girl's mother had caused a warrant to be issued for his arrest for seduction, and inquired if he would marry her, which he declared that he would

not do. He, also, refused to go to the home of the girl, and the policeman showing his badge, said: "I am here to see that you do go." When they arrived at the house, the mother of the young lady asked him if he intended to marry her and he still persisted that he would not do so. The mother threatened him with a criminal prosecution. He then agreed to go with them the next day and marry the girl and did so, but never cohabited with her. The court, in passing upon his complaint, among other things, declared, that a marriage will not be annulled for duress, except upon clear and satisfactory evidence, and that the presumption was, that when a man marries a woman, when charged with her seduction, he acted upon a sense of moral duty, and not from coercion, and that when he entered into a marriage under a charge of seduction, before he could obtain any relief from it, that it was necessary for him to prove the falsity of the charge. The court further said:

"The fact that the appellant was reluctant to make a promise of marriage is not evidence that he did not yield his free and full assent to the marriage, which was solemnized on the day following, by his procurement."

In Meredith v. Meredith, 79 Mo. App. 636, the father of the girl, who was the defendant in that action, obtained the license, procured the presence of the magistrate and the necessary witnesses at his dwelling, and, also, procured the young man, who was the plaintiff in that action, to come to his house at night, and when he arrived, the father stood with a pistol in each hand and informed the plaintiff that he must marry his daughter that night. The plaintiff, however, refused to consent to the marriage until the magistrate and witnesses, who were present, appealed to him to do a man's duty and enter into the marriage. After this he reluctantly consented to do so and underwent the ceremony of marriage with the daughter, while the father continued to stand with the loaded pistols. The facts showed that previous to that time the plaintiff had seduced the defendant and she was pregnant with child, and had seduced her under a promise, that if anything of that kind occurred that he would marry her, but before the marriage had notified her that he would not carry out the arrangement. The court in that case, when he sued

for an annulment of the marriage, because he had consented to it under duress imposed by the threats and demonstrations of the father, refused the relief, and among other things said:

"Equity will not bastardize an innocent child and brand the mother with an unholy name, as we are asked to do in this case, except upon the most convincing proof."

It further said:

"Threats and acts of intimidation do not necessarily prove duress and where the party was under a moral obligation to enter into or discharge a contract, the presumption is that he acted under a sense of moral duty, and this presumption should be weighed in the scales against the evidence of duress."

Commenting upon the real reason and motive for his agreeing to the marriage, the court said:

"When the appeal was made to him (that is by the magistrate to marry the girl) his better instincts for the moment got the mastery of his pride, and fear of being disinherited by his mother, and he stood up as he should have done and married the defendant."

It appearing that he had refused to consent to the marriage, although under the intimidation of the father's pistols and evident purpose to compel him to marry by the strong hand, and did not consent until the appeal was made to him to act the man by the magistrate.

In Quealy v. Waldron, 126 La. 258, two relatives of the defendant assaulted the plaintiff with pistols in his office and threatened him with violence if he did not marry the defendant, and stayed with him until the marriage ceremony was performed. He had never had sexual intercourse with the defendant and was not under any strong moral obligation to enter into the marriage, and the court held the marriage to be void on account of the duress and annulled it.

Where one is under arrest at the instance of a woman, upon whom he is charged with having begotten an illegitimate child or has seduced, and for that reason he marries her, the marriage will not be annulled because of duress and fear of imprisonment, unless the charge made in the suit is malicious and without cause. Williams v. State, 44 Ala. 24; Sickles v. Carson, 26 N. J. E. Q. 440; Jackson v. Wince, 22 Am. Dec. 563; Griffin

v. Griffin, 14 Anno. Cas. 866. This same rule has been held as applicable where a man guilty of illicit intercourse with a woman undertakes to procure an abortion and gets arrested upon criminal proceedings growing out of his attempt to create the abortion and marries the woman to escape the consequences of his crime. In Frost v. Frost, 6 Atl. 282 and in Carris v. Carris, 9 Green 516, it was held that where a husband sued for divorce upon the ground that his wife had procured the marriage to her by fraud, because of pregnancy with child at the time of the marriage by another, that if the husband himself had been guilty of criminal lewdness with his wife before marriage, that although she was pregnant by another, it was not sufficient to avoid the marriage for fraud, but where the husband had not been guilty of criminal intimacy with his. wife before marriage, and she was pregnant by another at the time, and the husband did not have knowledge of it, at once repudiates the marriage when he learns of her condition, that the marriage was voidable for fraud and would be set aside at the instance of the defrauded husband. In Seyer v. Seyer, 37 N. J. E. 210, and Carris v. Carris, *supra,* the doctrine was declared, that where the court is satisfied that antenuptial incontinence took place, that a charge of duress imposed, in entering into the marriage, by threats or other unlawful menace must be fully and satisfactorily established before the court will annul the marriage. These cases illustrate the doctrine, that where antenuptial incontinence existed, as in the case of a seducer, and where relief is sought from the marriage bonds because of threats or menace from the relatives of the woman, that the presumption of the law will be that the complainant entered into the marriage from motives to perform his moral obligations, and not because of any duress imposed upon him, and before the court will grant him a divorce or annul the marriage on account of the pressure brought to bear upon him to enter into the marriage, the facts must be such as to clearly and convincingly demonstrate that he entered into the marriage bonds solely from duress and such duress as overcame his will power and compelled him to do that which he otherwise would not have consented to do. The same doctrine is announced as being sustained by the great weight of authority in 9 R. C. L. 304, where it is said:

"The courts recognize that the seducer has done no more than he ought to have done, and in case of doubt prefer to attribute his action to the better motives of remorse for the wrong done and to a sense of justice. Certainly, if the seducer through the fear of the natural and probable consequences of his conduct married to escape them, it would not be such duress as would avoid the marriage in the absence of any force or direct threat of bodily harm at the time of the marriage."

The appellee was a young man twenty-two or twenty-three years of age, and who resided with his parents at Tolu, in Crittenden county, and the appellant is the only child of a farmer by the name of Phin Miles, who resided near the Ohio river and about five miles from Tolu. For about five years previous to the marriage, the appellee had been a constant visitor of the appellant at her father's house and at other places, and for a year and one-half preceding the marriage he had been her only suitor, so far as the record indicates. His last visit had been in the month of May preceding the marriage, but they had communicated by the telephone, how often it does not appear, between that time and the marriage. Five or six days before the 28th day of July, the appellant had gone to Rosi Claire, Illinois, which seems to be just upon the north bank of the Ohio. On the 28th day of July, Phin Miles, at the noon hour, learned of his daughter's condition and that appellee was the author of her misfortune, and he immediately armed himself with a pistol and went to Rosi Claire, and learning that the appellee was near the town, he went in search of him and met him returning to the town in company with one Davis, who was a partner or employee of his, and at whose house he boarded. After some casual words, Miles said to appellee that he wanted to see him, when they stepped off about ten steps from Davis, and Miles said to him that he had entered his home and ruined it and then asked him if he was going to marry his daughter. The appellee answered, "That is my intention," according to the testimony of Davis and according to that of Miles, he said, "I have always intended to." Davis testifies that Miles, while talking to appellee, had his hand upon his pistol, which he had withdrawn from his shirt bosom about one-half way. No harsh language or threats of violence of any kind was made use of by Miles. They proceeded from there to the home of Davis,

where the appellee was staying, and Davis accompanied them a portion of the way and after a short time came to his home where he found appellee taking a bath, with Miles standing in the door between the room in which appellee was bathing and an adjoining room. While there the appellee told Miles, that he had a pistol under the pillows upon the bed and Miles secured the pistol, according to his statement, at the direction and request of appellee. While there, Miles procured Mrs. Davis to communicate over the telephone to Tolu to a man there to come and meet them on the Kentucky side of the river with an automobile. The one sought for could not come, when one Franklin was engaged to come and meet them at the river bank. Mrs. Davis says that this was done at the direction of Miles, who testifies that appellee was the one who suggested Franklin when the other party could not be obtained. From Davis', Miles and appellee went to a store, where appellee purchased a tie, and from there to a barber shop, where appellee was shaved, during which time Miles went to a nearby store and procured some cigars. They then went to the river and took passage upon a boat operated by one Kilgore, and at the other side of the river they met Franklin, accompanied by a young man named Davis, who was the brother of the one at Rosi Claire, and the four of them proceeded in the automobile to Miles' home. Kilgore, as well as Franklin and Davis, testify that they observed nothing on the part of either appellee or Miles, which would indicate any strained relation between them. At Miles' home the appellant and her mother were in a swing in the yard. The appellee immediately approached them and inquired of appellant, if there was anything which she wanted to do before starting, and said to Mrs. Miles that there was no occasion for Miles coming to Rosi Claire, because he had always intended to marry the appellant. Mrs. Miles asked him if he would be good to her child and said if he would that she would love him so much. He answered that he would treat her as well as he could. Mrs. Miles and appellant went into the house, where they redressed and, while they were doing so, Miles and appellee sat upon the back porch and while there a brother of Miles came and remained a few minutes, and he testifies that appellee handed him a pistol with the request that he would take it to his uncle at Tolu when he should go up

there. He, also, states that while there the appellee called for appellant and went into the hall and had some minutes of conversation with her. Before Miles' brother came, Miles, as testified to by Franklin, took the cartridges from the pistol which appellee had and threw them in the yard, and, also, had his own pistol in his hand and was commenting upon its qualities. Appellant and appellee and appellant's father and mother then got into the automobile and with Franklin, as chauffeur, drove them to Marion, at which point they arrived at about nine o'clock in the night. They called at the home of the county court clerk and as testified to by him, the appellee said to him, "Get your toboggan and come on up here," or words to that effect. The clerk got into the automobile with the others and they proceeded to his office, where the clerk said to appellee, "It's a marriage license, I suppose?" and appellee assented; the license was issued, and appellee then inquired of the clerk, if there was a preacher convenient, and said that he did not care what kind of a preacher it was, just so it wasn't a Methodist. The clerk named a minister who lived near the court house and the appellee went to a telephone and communicated with the preacher and notified him that they would come around to his house. When appellee and Miles and the clerk came out of the court house, Franklin had gone to a store for some oil, when appellee asked where he was and being informed, he said he would go after him, which he did and met Franklin about one hundred and fifty feet away. They returned and all got into the automobile, accompanied by the clerk, drove around to the home of the minister, when the appellant and appellee got out upon the sidewalk and the minister performed the marriage ceremony, and then said that he was glad that they had come and appellee answered that he was glad to be there. Nothing was seen or heard by the clerk or by the minister, which indicated that any strained relations existed between any of the parties. From Marion they returned to the home of Miles, when the appellee suggested that as they had a means of conveyance convenient, he would return to Rosi Claire that night. Miles suggested that he remain there, as it was late and that he would provide him a conveyance in the morning to go back to the river, so as to return to Rosi Claire. Young Davis, who was then present, as

well as Mr. and Mrs. Miles, state that the appellee then consented to remain. They had supper and very soon thereafter Miles retired for the night. Appellee then went upon the back porch and drank a bottle of beer and then he and appellant occupied the same room and the same bed that night. The next morning appellee suggested that appellant would go with him to Rosi Claire, but the father said that he did not think that it. would be for the best, as his daughter's condition was such that it would be embarrassing to her over there. Appellee left on that morning, with a statement that he would return on Saturday or Sunday. While being ferried over the river he told the ferryman that he had been married the night before and when the ferryman asked to whom, he said Willie Miles. The ferryman then asked if they would live down on the farm at Miles', when he answered that either he or we, the ferryman failed to remember which, would live at Tolu. On Sunday he returned to the home of Miles and spent several hours there and went away. On the following Sunday he came to the home of Miles accompanied by his brother and with an automobile and took the appellant to his home at Tolu. It is claimed that he did this under a threat of Miles, but Miles was then at his house and appellee was at Tolu, five miles away. She remained there from Friday until Sunday, when he brought her back to her father's. Several days thereafter he sent a buggy for her and she came to his father's, where he lived, and remained for about ten days and then returned to her home, and after that, as was stated by her mother, the appellee refused to allow her to return to him any more. It is stated for the appellee that he said to her that he would provide her a home at his father's in Tolu, where she could go and remain as long as she desired. It is furthermore proved by the father and mother of appellee that while the appellant was at their home that she and appellee did not cohabit, as a husband and wife, but that she occupied a room at their home while appellee slept at a telephone exchange. While she was at the home of his father, appellee gave her a check, one time for between four and five dollars and at another time for ten dollars, which check he made payable to Mrs. Willie Shepherd. Between the times that appellant was at the home of appellee in Tolu, the father of appellant, under the influence of intoxication,

was at the telephone exchange and an altercation took place between him and appellee in regard to conditions existing between appellee and appellant or as to where they should live, it does not clearly appear which, but in this altercation, it is made to appear, that Miles' pistol was taken away from him in some way and appellee made him sit down and hold up his hands. On this occasion Miles said to appellee that he wanted him to come and live down at his place and he would give him a portion of his farm, which proposition the appellee declined, with a statement that he did not want anything that he had. Portions of the evidence offered upon either side was incompetent, but as neither party had the court, below, to pass upon exceptions to the competency of this evidence, we presume that all objections to it upon both sides were waived.

Very little doubt can exist that the appellant and appellee had sexual relations previous to their marriage, and that appellee was responsible for her pregnancy, the result of which was the birth of a child on the 22nd day of October following the marriage on the 28th day of July. As was said before, the appellee in his reply, while he denies that the pregnancy of appellant arose from any sexual connection with him, does not deny that he was guilty of having sexual intercourse with her, and the record does not contain any denial by him of such relations. His father testifies that about three months before the marriage a neighbor had informed him that a report was in circulation that the appellant was pregnant and that appellee was responsible for it; that he inquired of appellee at once about it, when appellee said to him that he hoped she was not in that condition, but that he was afraid that she was, and, however, at the same time, although he did not deny that he had been guilty of being sexually intimate with her, said that he knew that he was not the father of the child. It seems that at the same time, they discussed the propriety of a marriage between them, and the appellee stated that he had never agreed to marry her, and that in fact they had both agreed that they did not want to marry each other. Upon the other hand the appellant made representations that they were engaged to be married and that appellee was the father of her unborn child. The appellee furthermore stated to the mother of appellant on the Sunday after the mar-

riage took place that the marriage was not legal, and that he could do something after the child was born, or that in substance. Appellant's mother, also, stated that he said to her that he did not intend for appellant's condition to become known and that in March, when Dr. Lowry came to visit her he requested Lowry to examine her to see if · there was anything the matter, and also, requested Lowry to assist him in getting her away from home, if there was. So there can be no doubt that when he was called upon to marry the appellant by her father he fully understood the entire situation. He then knew that she was pregnant, and after the marriage he was suggesting a method of settlement by which he was to contribute by doing something for the child, and he is the only person shown by the evidence and circumstances to have been upon such relations with her as to justify the belief that intimate sexual relations existed between them. It would be incredible to suppose that he would propose to contribute something toward the child and to have carried her to his father's home and kept her there or at least permit her to remain there for the two occasions mentioned with knowledge that she was then *enciente* by any other person than himself. Under the rule heretofore mentioned, the appellee having had antenuptial sexual relations with the appellant and the cause of her pregnancy, before he would be entitled to be relieved from the marriage bonds which he entered into with her, it would be necessary to prove by very convincing evidence that he consented to the marriage solely from fear of bodily harm at the hands of appellant's father, because it is to be presumed that he entered into the marriage from the moral obligation resting upon him to repair the wrong that he had done her. It, also, rests upon him to show that he did not ratify the marriage by exercising any of the marital rights after constraint was removed from him, if such ever existed. If there were no circumstances in evidence except the father of appellant armed with a pistol, which he was carrying in his bosom, with his hand upon it, and staying with the appellee until the marriage ceremony was performed, it might be inferred from that, that the appellee's consent to the marriage arose from bodily fear and that he really did not consent, but when it is considered that although in the presence of his partner or employee,

Davis, and although in the presence of Kilgore the ferryman, and with Franklin and Davis, who show themselves to be his friends, from the river to the house of Miles and from there to Marion, where they came in contact with the officers and numerous persons, the appellee never at any time uttered a word of protest and did not seek to avoid in any way the intended marriage between himself and appellant; the fact that it is proven that he announced when accosted by Miles that it was his intention to marry her, that he said to appellant and her mother, that it was useless for Miles to have come over to Rosi Claire, that he always intended to marry appellant; that he himself secured the preacher to perform the marriage rites; that when there was no constraint upon him, he spent the night with appellant; that he proposed to take her to Rosi Claire with him; that he took her to his father's house on two occasions; that she remained at the one time two or three days, and the other, ten days; that he gave her checks for money, in one of which he denominated her as his wife; that in the altercation which occurred in the telephone exchange between him and Miles and in which, although it is testified that Miles was regarded as a dangerous man when drinking, the appellee coldly and without any signs or indications of fear, bullied him; in some way or other got his pistol from him and made him sit and hold up his hands; his indifference to Miles' threats, at that time and the cool manner in which he talked and treated him, showing no trepidation or fear whatever, we are constrained to the belief, that although, doubtless, he hoped in some way to avoid the marriage and entered into it with great reluctancy, it was not the demonstrations of Miles that caused him to do it, but that when called upon by Miles he resolved to go forward and marry the appellant to rid himself of the consequences which might follow, other than bodily harm, or perhaps to perform the obligations of honor which he owed to her. Hence, we conclude that the judgment granting the divorce was not justified, but a divorce from bed and board should have been granted to her, but the judgment granting him a divorce having been rendered, it can not now be disturbed, and unless some relief is extended to the appellant, the result is that the appellee is freed from all obligations and the burden of maintaining the child and all the consequences of their joint acts must be borne by her, alone.

In Willett v. Willett, 76 Neb. 228, was a case wherein a plaintiff, who had been married when an infant and abandoned his wife when he arrived at the age at which, under the statute, he would be legally bound by the marriage, and secured a divorce from his wife upon the ground that his infancy, when he entered into the marriage, made the marriage under the statute there in force a voidable one. The court, however, required him to pay alimony to the wife, as it said:

"At least to the extent of the financial burden he has · cast upon her."

The burden referred to was a child, which had been born as the result of the marriage and cohabitation. Having arrived at the above conclusion in this case, it seems that the appellee should be required to pay the appellant a reasonable alimony and maintenance for the child. This allowance will, however, have to be in accordance with his ability to pay. Under the rule, which requires the husband to pay the costs of a suit for divorce and a reasonable attorney's fee to the wife, unless she is in the wrong and had ability to pay, the appellee should, also, be required to pay a reasonable fee for the benefit of her attorneys.

The county attorney can not contract for or be paid any fee in an action for divorce, other than is prescribed by the statute. It is his duty to resist the granting of all divorces, and if successful, the statute fixes the fee which shall be paid to him and taxed as costs. Section 2119, Ky. Statutes.

It is, therefore, ordered that the judgment appealed from, so far as it dismisses the claim of appellant for alimony, and for a reasonable fee for her attorneys and denies such relief to her, is reversed, and this cause is remanded with directions to set aside that portion of the judgment and to adjudge that she recover of appellee alimony and maintenance for the child to the extent of one hundred and fifty dollars per year, and, also, that he be adjudged to pay a fee of fifty dollars to her attorney, other than the county attorney, for his services. The case should be kept upon the docket for such order for the enforcement of the judgment, and for adjustment of the judgment and maintenance for the child as may be necessary.