## JOHNNIE CANNON v. VIRGINIA CANNON.

Western Section.   March 23, 1928.

Taylor, Adams & Freeman, of Trenton, for appellant.
No Counsel Marked, for appellee.

OWEN, J.   The complainant has appealed from a decree dismissing his bill in the chancery court of Gibson county.   Said bill was filed on the first day of August, 1927, and he alleged that he had been forced by threats and duress into entering into a marriage contract with the defendant on April 18, 1926 in Gibson county, Tennessee; that he married, the defendant, the ceremony being performed by a Justice of the Peace; that he and the defendant went after the marriage ceremony to the home of a relative of complainants where the defendant and complainant resided for about two weeks; that they did not sustain the relation of husband and wife during that time;

that the defendant went back to her father. The complainant alleged that on Thursday before the marriage ceremony was performed on Sunday the defendant's father came into the field where complainant was at work with a loaded shotgun; that he cursed the complainant and drew the gun on complainant and that he (complainant) ran behind a team of horses and that complainant's father who was working in the field at the time grabbed the gun and took it away from Mr. Frazier, the defendant's father. That the father of defendant then and there told complainant if he did not come to his (Frazier's) house on Sunday and get the defendant and marry her that he would kill him (complainant) on Monday. Defendant's father insisted that complainant had wronged his daughter, the defendant, but complainant denied the charge and he insisted that his marriage to the defendant was the result of duress, force and threats and not his own desire and consent, and that the same was voidable; that it was never ratified and never rendered valid. He prayed that on the hearing the marriage be declared fraudulent and void and set aside and he be restored to the rights and privileges of an unmarried person.

Process was served upon the defendant. No answer was filed. Pro confesso was taken. Chancellor V. H. Holmes was of opinion that the complainant was not under duress at the time the marriage ceremony was performed.

There was a petition for an additional finding of facts in which it was sought to have the court find that at the time of the marriage the complainant acted under duress; that the complainant went to the defendant's father's house because he was afraid not to go. The Chancellor declined to find any additional facts.

Upon the bill being dismissed the complainant excepted and prayed and was granted an appeal to this court; perfected the same and has assigned five errors, which five errors raise only one proposition, which proposition is set forth in the fifth assignment, said assignment being "the Chancellor committed error in refusing to find and decree that the complainant married defendant under duress and that the marriage was void, and not dismissing complainant's bill."

The bill of exceptions sets forth the evidence in narrative form, and we will set it out in this opinion in full:

"The first witness, the complainant, Johnnie Cannon, after being duly sworn testified.

"That he was twenty-two years old August 8, 1927, and has lived in the country all of his life and is the son of R. D. Cannon, and a farmer; that before his marriage to the defendant, who was a Miss Virginia Frazier, he was never with her but one time, having had only one engagement with her; that he is afflicted with an extreme nervous trouble that causes him to jerk as he does; that on April 15, 1926, he was working in the field and Mr. Frazier, father of the de-

fendant came to the field where he and his father were and had a loaded shotgun with him and said 'You God damn son of a bitch you have ruined my daughter and I am going to kill you if you don't marry her,' and that he told Mr. Frazier then and there that he was never with the girl but one time and never ruined her or had any improper relations with her, and that he ran behind the team to prevent being shot, and that his father took the gun away from him, and he threatened to kill his father also, if complainant didn't marry the girl; that he denied the charge then and there and maintained his innocence, and that complainant's father stated to Mr. Frazier to give the boy until Sunday, and thereupon Mr. Frazier said 'I will give you until Sunday to marry her and if you don't do it by then and come and get her yourself, I will kill you Monday.' That he was frightened and afraid that he would kill him; that he talked with his father and uncle, T. D. Bennett, neither of whom would advise him what to do, and that being young and inexperienced he did not know what to do, so on April 18, 1926 and before Monday following the threats, he went to the girl's home and got her and took her to a Justice of the Peace and married her in Gibson county, Tennessee and in the jurisdiction of this court; that he asked T. D. Bennett to purchase the license which he did; that he did not have sufficient funds with which to purchase the license. He saw Mr. Frazier about the place when he went for the girl but did not speak to him; that immediately upon marrying he went to the home of T. D. Bennett, and never slept with the defendant nor did he have sexual relations with her at any time before or after the marriage. He slept with T. D. Bennett each and every night and the defendant slept with T. D. Bennett's mother, each and every night.

"That after the marriage he talked to defendant about it and she said to him that he was not guilty and that she tried to prevent her father from doing what he did. In six days after the marriage complainant learned from the woman in the house where they were staying that defendant's menstruation period came and therefore she was not pregnant, and that in two weeks from the date of the marriage defendant left and returned to her father's home where she has since been and is now, and that he had not talked to her nor her father since, and that she was not pregnant, nor did she give birth to a child, and that at no time did he ever have sexual intercourse with her.

"He married her only because he was afraid Mr. Frazier would kill him as he had threatened, and had it not been for that he would not have married her. All of these facts and marriage occurred in Gibson county, Tennessee, and within the jurisdiction of this court. He married her because he was afraid not to on account of the threats to kill him.

"The next witness R. D. Cannon, after being duly sworn testified that he is the father of complainant, a renter and poor man; that he was present in the field on April 15, 1926, when Mr. Frazier, father of the defendant, came to the field where he and complainant were at work and drew his gun on complainant and said 'you God damn son of a bitch you have ruined my daughter and I am going to kill you if you don't marry her!' and that he also cursed this witness, and that the complainant dodged behind the team and that he grabbed the gun which was loaded, and took it away from Mr. Frazier. His son the complainant then and there stated to Mr. Frazier that he had only been in the girl's company one time and had never had sexual relations with her and was not guilty of ruining her, but Mr. Frazier repeated that he had to marry her or he expected to kill him. Thereupon this witness stated to Mr. Frazier to give the boy a little time about it and asked him to give him until Sunday, and thereupon Mr. Frazier stated that if he did not come himself and get the girl and marry her by Sunday that he would kill him on Monday. Johnnie Cannon talked to him about it, always insisting that he was not guilty and asked what to do, and stated that he was afraid he would be killed if he did not marry her. Complainant has no property, is afflicted with the extreme nervous trouble, and never gave him any trouble, and is an inexperienced boy, being born and reared in the country. Defendant admitted to him after the marriage that complainant was not guilty and had not had sexual relations with her, and said she tried to get her father not to do what he did, but he wouldn't listen.

"The next witness T. D. Bennett, after being duly sworn testified that on April 15, 1926, he was working and saw Mr. Frazier go to the field where Johnnie Cannon was at work and draw his gun and that he rushed there and that Mr. Frazier told said Johnnie Cannon that he would kill him if he didn't marry his daughter, that he would shoot his God damn head off, and cursed violently, and drew the shotgun on Johnnie Cannon, who dodged behind the team of horses and that R. D. Cannon took the gun away from Mr. Frazier. Johnnie Cannon denied ever having sexual relations with the defendant, stating to Mr. Frazier that he had only been with her one time, and that Mr. Frazier also cursed R. D. Cannon on that occasion. R. D. Cannon asked Mr. Frazier to give the boy a little time about it, and that Mr. Frazier said 'if he don't come and get her and marry her by Sunday, I will kill the son of a bitch on Monday.'' After that Johnnie Cannon talked with him about it and asked his advice, but that he would not advise him what to do. and that Johnnie Cannon said that he was afraid Frazier would kill him if he didn't marry her by Sunday, and therefore he asked this witness to procure marriage license, which he did, and that they were married that Sunday before a Justice of the Peace, and went to the witnesses home where

they stayed for two weeks. While there Johnnie Cannon slept in the bed each and every night with him, and the defendant slept in the bed each and every night with T. D. Bennett's mother, who is an old woman; T. D. Bennett is a man fifty years of age. The sixth day after the marriage, he learned from the woman at the house that the defendant's menstruation period was on her and therefore that she was not pregnant, which fact was also communicated to complainant. Complainant did not treat defendant as his wife at any time and had nothing to do with her and that they stayed in his home the entire two weeks and each and every night thereof, and never slept together. Complainant is an inexperienced boy, reared on the farm and been about only little, and is a good moral boy. Complainant and defendant and her father lived in the same civil district of Gibson county, Tennessee at the time of the marriage.

"This was all of the evidence introduced on the trial of this cause."

Marriage is so far an ordinary civil contract that its basis is the mutual consent of the parties, and if under duress there is no consent for the essence of the contract is wanting. 9 R. C. L., page 302.

To constitute a valid marriage the parties must possess the legal qualifications and enter into a mutual agreement, uninfluenced by fraud or error in any particular deemed fraudulent or by duress. Spencer on Domestic Relations, p. 37; Crouch v. Wartenberg, W. Va. Sup. Ct., 103 S. W., 117, 11 A. L. R., 212.

A court of chancery, by virtue of its ordinary equity powers, possesses jurisdiction to entertain a suit for the purpose of annuling a marriage supposed to be void, or as to the validity of which some doubt may exist. 10 R. C. L., 341.

Duress consists in any illegal imprisonment or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another and actually inducing him to do an act contrary to his free will. Code of Ga., sec. 2632.

By duress in its more extended sense, is meant that degree of severity, either threatened or impending or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness. Duress per minas is restricted to fear of loss or life, or of mayhem, or loss of limb or other remediless harm to the person. Fellows v. School Dist., 39 Me., 559; 4 Bl. Comm., 30.

The reported cases involving the question of annulling a marriage on the grounds of duress are few. The contract of marriage obtained by duress being voidable is often ratified by the acts and conduct of the party forced into the marriage. In Tennessee we have three reported cases where the marriage was questioned on the ground of having been obtained and performed by fraud and there was a bill seeking to declare the marriage void.

24

In the case of McKinney v. Clark et al., decided in 1852 reported in 2 Swan, p. 320, our Supreme Court, speaking through Justice McKinney, said: "Marriage is emphatically a personal contract and its basis is the mutual consent of the parties. But, in the language of Mr. Story, it is something more than a mere contract. It is rather to be termed an institution of society founded upon the consent and contract of the parties and in this view has some peculiarities in its nature, character, operation and extent of obligation, different from what belongs to ordinary contracts. When consummated according to law, it is of perpetual obligation and cannot be renounced at the will of either or of both parties. It continues to exist until a dissolution is produced either by death of one of the parties or by a divorce."

In the case of McKinney v. Clark, supra, McKinney recovered several judgments against Mary Sullivan, the widow of one Cornelius Sullivan. Cornelius Sullivan had devised to his wife a plantation and six slaves during her natural life or widowhood with remainder to his children. Mary Sullivan's life interest in the plantation and slaves was levied on by McKinney. Shortly before the day agreed for sale of said property, Mary intermarried with the defendant Clark. McKinney filed a bill seeking to have the marriage between Mary Sullivan and Clark declared void and the annual the marriage on the ground of fraud and to subject the property to the satisfaction of complainant's judgment as if no such pretended marriage had taken place. In delivering the opinion, the court said: "This is a novel case. The books to which we have access have been searched in vain for a parallel, but upon principle, it presents no difficulty."

It was held that the bill was brought by a stranger to the marriage contract upon the ground that the motive of the parties contracting such marriage was to defeat some right of remedy of the complainant. The court held that the motive which prompted the marriage or the consequences flowing from it could not be questioned by the complainant. If a marriage may be annuled for fraud, it must be such a fraud as operates by the one or other or the immediate parties to the contract and has the legal effect of vitiating the contract between the parties ab initio. Complainant's bill was dismissed.

In the case of Cole v. Cole, 5 Sneed, 57, decided in 1857, Judge Caruthers, speaking for the court, said: "Marriage is a civil contract and may be voided like any other contract, for want of sufficient mental capacity in the parties. If the mind is unsound at the time it is incapable of consent. That is an essential element in all contracts."

In the Cole case, supra, the Supreme Court held that the complainant had affirmed the invalid marriage to the defendant, holding that a marriage, although invalid at the time thereof, may be

ratified and made valid afterwards by any acts and conduct which amount to a recognition of its validity. So a lunatic on regaining his reason may affirm a marriage celebrated while he was insane, and this without any new solemnization.

In Willard v. Willard, 6 Bax. 297, the Supreme Court, speaking through Mr. Justice McFarland, said: "Mutual consent is the basis of the marriage contract and when this has been given by either of the parties under duress, the marriage is voidable," citing with approval McKinney v. Clark and Cole v. Cole, supra.

The complainant in the Willard case alleged that he was met upon the highway by a brother of the defendant, and under actual duress forced to submit to the form and ceremony of a marriage with the defendant; that within a few days, as soon as he could escape the duress, he abandoned the defendant and had never lived with her and had never recognized her as his wife. The prayer of the bill was for a divorce and that the marriage be declared void. A demurrer to the bill was sustained, on the ground that none of the statutory causes for divorce were charged. The Supreme Court reversed the lower court and remanded the cause for an answer.

"The consent required to constitute marriage is a consent to be bound by the contract, and to assume the duties and responsibilities imposed by law upon the parties to the status." 38 C. J., 1299.

"A marriage, the consent to which has been induced by force or coercion, is not void, but voidable. Unless voluntarily ratified it may be avoided at the election of the injured party." 38 C. J. 1304.

"Where the appearance of consent was based on mistake or where the consent was procured by fraud, force, or coercion, the law will in a proper case give relief." 38 C. J., p. 1300.

It is not absolutely necessary that the duress or force must be exerted at the same moment the contract is entered into so long as "an influence is exerted on one so as to overcome his will and compel a formal assent to an undertaking, when he does not really agree to it and it is imposed on him through fear, which deprives him of self control, there is no contract. It is on this ground that contracts may be avoided because of duress. Moreover courts of equity will relieve a party doing an act or making a contract when he is under the influence of extreme terror, or of apprehension short of duress, for the reason that in cases of this sort he has no free will, but stands in vinculis." · 6 R. C. L., p. 638.

Force implies a physical constraint of the will. Threats of bodily harm or death produce fear which overcomes the will. "What amount of force is sufficient to invalidate a marriage is a question of circumstances. The general rule is that the amount of force as might naturally serve to overcome one's free volition and to inspire

terror will render the marriage null." Schouler on Domestic Relations, p. 23.

"A party to a marriage must not only be competent to give his consent thereto, but such consent must be a real consent; that is, it must be given voluntarily. A consent given under duress or misapprehension, or procured by fraud is not such a consent as is essential to a binding marriage." Long on Domestic Relations, p. 54.

"A consent to a marriage given under duress is no consent, and, if, it appears that one of the parties consented thereto through fear, or duress, the marriage is not binding." Long on Domestic Relations, p. 55.

"In cases in which the party coerced seeks to have the marriage annulled, it will generally be found that the marriage has never been consummated, and the parties separated immediately after the ceremony. This fact, of course, would not, of itself, prevent the marriage from being binding, but it would more strongly incline the court to dissolve it, and, where the nonconsummation was due to the plaintiff's refusal to cohabit with the defendant, it would undoubtedly be (evidence tending to establish the fact of coercion. On the other hand, it would seem that the voluntary consummation of the marriage after the removal of the alleged coercion would tend to prove the absence of coercion." Long on Domestic Relations, p. 60.

Mr. Bishop in his work on marriage and divorce, states the trend of judicial decisions in this language: "We may observe that the fact of the marriage not having been consummated has in many instances powerfully influenced the court to set it aside." Bishop on Marr. & Div. Vol. 1, p. 214.

It is also true, that, in all cases where the party entering into the form of marriage gives no real consent because the will is overpowered by arts of coming, or the force of menace, or by other means, the marriage remains a nullity until, as it sometimes happens the will in a disenthralled condition affirms the marriage." Bishop on Marr. & Div. Vol. 1, p. 205.

In vol. 4 A. L. R., p. 864 the author has annotations from a number of states on the question of the validity of a contract executed under duress, exercised by third persons. Says the author: "Duress, like fraud, rarely, if ever, becomes material, as such, except on the footing that a contract or conveyance has been made which the party wishes to void. It is well settled that where, as usual, the so-called duress consists of only threats, the contract is only voidable. The ground upon which a contract is voidable for duress is the same as in the case of fraud and is that, whether it springs from a fear or from a belief, the party has been subjected to an improper motive for action. If one threatened another to kill or maim him if he did not seal a deed to a stranger, and thereupon he do so,

this is void as if it were to the party himself.'' In Thoroughgood's case (1582) 2d Coke, 976; Eng. Reprint, 408, 6 Eng. R. C. L., 202, it was said that ''if a stranger menace 'A' to make a deed to 'B,' 'A' shall void the contract which he made by such threats as well as if 'B' himself had threatened him.''

''A marriage procured by fraud, abduction or terror is not void, but voidable and may be vacated by the person imposed upon. Tompert v. Tompert, 26 Am. Rep., 197.

In the case of Fowler v. Fowler, 131 La., decided January 20, 1913, Judge Moore, delivering the opinion of the court said: ''Plaintiff was coerced by a threat of death as the alternative to enter into the contract which he seeks to annul. The defense relied on is that thereafter he voluntarily ratified said contract, but we do not find that to have been the case. The alleged ratification was clearly the result of the same form of coercion as that which was originally applied.''

It appears that the plaintiff lived with his wife in her father's home for about six weeks, occupied the same room and the same bed; but the father had threatened the plaintiff's life if he deserted the wife and the court held that the duress continued and granted the plaintiff an annulment of the marriage.

In the case of Marks v. Crume, 16 Ky., 707, 79 S. W., 436, it was held that fear inspired by the threats and demonstrations of the relatives of the other party to the marriage, which compelled one to consent to a marriage was sufficient to annul a marriage. The court said: ''It did not appear that the defendant was guilty of any force or duress, but the proof would conduce to show that friends or relatives of the defendant did by threats of duress compel the plaintiff to enter into the contract.''

This case was approved by the Supreme Court of Kentucky in Shepherd v. Shepherd, decided in 1917—174 Ky. 614; 192 S. W., 658.

Some states, however, hold that the validity of a marriage insofar as the wife is concerned, is not affected by the fact that the husband was under duress practiced by third persons, she being in ignorance of the duress at the time of the marriage. Schwartz v. Schwartz, 29 Ill., 516; Jerman v. Jerman, 47 N. Y. S. Rep., 404.

In the instant case we find as a fact that the complainant married the defendant under duress. Nothing could be more threatening than the attitude of defendant's father toward complainant when he (defendant's father) went into the field where complainant was at work and there drew a loaded shotgun upon complainant and probably would have killed complainant then and there had he (complainant) not run behind his team and had the father of complainant not taken the gun from the infuriated father of defendant.

Defendant's father yielded to a postponement of his threats until the following Monday, provided the complainant did not, later

than Sunday, come to the home of the defendant and marry her. The proof shows that the complainant at the time of these threats was under twenty years of age; that he was afflicted with some nervous trouble which caused his head to shake constantly, or, as stated by some of the witnesses "to jerk"— a nervous trouble. He appealed to his father and to his uncle for advice. There is no proof to show that the complainant had ever been out of Gibson county. While he protested his innocence in regard to any wrong to the defendant, yet we are of opinion that this threat made by the father of defendant intimidated and coerced complainant until after the marriage; that it was like a dark shadow or pall of gloom that hung over complainant from the time that the infuriated father of defendant appeared in the field until defendant returned to her home. No doubt the words said by the Justice of the Peace pronouncing complainant and defendant man and wife, fell upon complainant's ears as a sounding brass or a tinkling cymbal. Neither the complainant or the defendant seemed to realize that they were married and the ceremony was meaningless to them. The defendant knew of her father's conduct and stated to some of the witnesses who testified that she tried to induce her father not to make the threats and force the complainant to marry her.

We are of opinion that no valid marriage was entered into by the complainant; that by reason of the threats and duress he should be granted the relief sought.

We realize that courts should be slow to render void or annul any contract, and especially a marriage contract.

"A marriage contract has its foundation in nature and resting in its origin, upon the mere consent and mutual agreement of the parties, when couple according to civil regulations, becomes indissoluble, except by death or divorce; and so long as the relation is acquiesced in by the immediate parties no tribunal on earth is clothed with the jurisdiction to interpose to annul it." But in the instant case the complainant never gave his consent to the marriage. There was no mutual agreement of the parties. There was no relation of man and wife acquiesced in.

We are of opinion that, under the facts of this case and the law applicable thereto, the marriage should be annulled and the complainant should be granted the relief sought.

It results that the assignments of error are sustained and the judgment of the lower court is reversed and a decree will be entered here granting the complainant the relief prayed for in his bill. The complainant and his surety on appeal bond will pay all the cost of the cause, for which execution will issue.

Heiskell and Senter, JJ., concur.