# Mottley v. Vittitow.

(Decided June 20, 1933.)

HUBBARD & HUBBARD and H. C. T. WHITTENBERG for appellant.

RICHARDSON & RICHARDSON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming in part and reversing in part.

As authorized by section 2100 of the Statutes, the appellant sought to have the chancellor declare his marriage to the appellee void upon the ground that it had been entered into on his part by reason of force and fraud used upon him. The prayer being denied and an allowance of $40 a month ordered for the maintenance of appellee's infant child and herself, the appeal is prosecuted.

Both parties testified without objection. The appellant met the appellee in the spring of 1931 at a dance hall, and he says he saw her rather infrequently until the marriage the following November. The testimony of the appellee and her witnesses is that he was frequently and regularly with her and paid her constant court. It appears that he ceased his attentions altogether in September or October. The appellant was employed as a driver of a milk wagon, and in the afternoon of November 12th the appellee's two brothers accosted him on his route, and, according to his evidence, they told him their sister was in a family way and if he did not come with them and marry her they would kill him, and at the time one of them had his hand to his pocket in a threatening manner. He told them that he did not have to marry their sister and was not responsible for her condition. They insisted upon his going, but he told them he could not leave his truck, and so they said they would ride with him. They did so until he had completed his route and compelled him

to go to their home. There was a meeting with the girl, her brothers and sister. He agreed to marry her because, he testified, he would have agreed to do anything, being in fear of his life. This was about 4 o'clock in the afternoon. He was permitted to leave and go home to change his clothing upon the promise that he would return that evening at 7:30 o'clock. He did so, and, accompanied by the two brothers, he and the girl went to Jeffersonville, Ind., to be married. But it was found on arrival that the cost of the marriage was more than they all had. The party then returned to Louisville, and, under threats of harm if he did not, he agreed to return the next night. He did so, and the party again proceeded to Jeffersonville on the night of Friday, the 13th of November, and were married. Coming back to Louisville, he left the young lady at her home and went his way.

The evidence of the other side is quite different. It appears that for some time the young lady had been unsuccessfully trying to get in communication with appellant. The two brothers testified that he readily consented to talk with them when they met him. When they told him their sister had been trying to see him, he inquired, "What is it all about?" They informed him of her condition, and he said he would be down after work. They suggested helping him finish up, and with his consent the younger brother went along with him on the truck. The older brother walked home. After a time the appellant came and asked the young lady if she thought enough of him to marry him, and, when she consented, he responded, "That is the thing to be done," and said they would get married that night. He went away and returned in his own automobile that evening and took the party to Jeffersonville. According to the testimony of the girl and her two brothers, everything was agreeable and pleasant, and the appellant took the lead. Not being successful that first evening in getting the marriage performed because of insufficient funds, the appellant came back the next evening and again took the party to Jeffersonville, where they were married and everything was pleasant enough. There was no sort of duress imposed. The young man's mother was quite ill at the time, and he said he would try to get a place of their own, which he thought he could do in a month or so. It is admitted that he left the young

lady at her home that night and never lived with her. He went back to her home on Saturday and gave her $5 and again on the following Saturday and gave her $5 more.

It is also in evidence that during the time intervening between the first and second visit to Jeffersonville the appellant was very nervous and perturbed. He was thought to be sick by his family, but told them that he was not, and refused to tell what was bothering him. On Saturday night he consulted a lawyer friend concerning the situation. After the call upon the young lady on the second Saturday, when he was told by her father in emphatic language that he must live with the girl, he went to Bowling Green and stayed about two weeks. When he returned to Louisville, he instituted this suit for annulment of the marriage.

A child was born February 18, 1932, which was three months after the marriage. The appellant very vigorously denies its paternity, and testified that he had never been intimate with the young lady. He introduced a witness who testified to some lewdness upon her part upon an occasion about four years before, but of the two witnesses who might have coroborated him one had died and the other was in Texas. An effort to secure his deposition upon interrogatories was made, but it was not filed. The sole witness as to this matter was very active in behalf of the plaintiff in the case, and evidence of the incident is not very persuasive. There is some other evidence that in May, 1931, which was about the time the child was conceived, she had attended a party in the apartment of some young men where there was considerable drinking. On the other hand, the appellee, with equal vigor, denies that she was ever intimate with any other man, and testifies that upon three occasions in the latter part of May, or the first of June, she was intimate with the appellant. She, of course, denied any improper conduct upon the occasion of the party just mentioned. There is some little evidence tending to show that the young man himself was lacking in a proper conception of the proprieties toward young ladies.

Cases of this kind are very difficult. There can be nothing absolutely certain about the correctness of a decision with respect to the paternity of a child under

such conflicting testimony and circumstances. If a judicial error is made the consequences are tragic. Aside from the question of the appellant's guilt of being the author of the young lady's shame, and hence the genuineness of the cause which actuated her brothers, the evidence of duress and fraud, it seems to us, falls short of sustaining the burden assumed by the plaintiff to establish it. The truth of the matter doubtless lies somewhere between the extremes of the two conflicting stories. He was 28 years of age, weighed about 135 pounds, and wore a truss because of a hernia. A friend testified that, in addition to being weak physically as thus manifested, he was always something of a coward and easily put in fear. His own testimony is that he was at all the times related under great terror and was afraid to do other than he did do. It is a very significant fact, however, that on the first day he had several hours and thereafter had almost twenty-four hours away from the constraint and from the cause of his terror. During this time he might well have sought and found relief among his friends or the police, or might easily have concealed himself. His action is hardly consistent with his testimony of yielding to force. To meet the representation of physical weakness, perhaps some effect should also be given to the fact that the older of the two brothers had just come from a tuberculosis hospital and was physically lighter and weaker than he, and that the other brother was several years younger and also of very light weight.

The testimony was introduced orally before the chancellor. After hearing and seeing the parties and the witnesses, he reached the conclusion that the plaintiff had not sustained the burden of proving the marriage to have been the result of duress and fraud. We concur in his opinion that:

> "There can be no doubt that he was very much terrified during the time and it is established that he sought the advice of his counsel with reference to an annulment of the marriage on the day following the marriage. This certainly shows that he did not wish to marry defendant but it does not show necessarily that the marriage was brought about by duress. A man may do many things he does not want to do and yet be responsible for the consequences of what he does."

The law governing the case is fully stated in Shepherd v. Shepherd, 174 Ky. 615, 192 S. W. 658, and need not be reiterated.

The appellant's wages at the time of the trial were $25 a week. He had some comparatively heavy obligations to meet on account of the sickness and recent death of his mother. The court costs of this proceeding are heavy. Considering all of the circumstances, we are of the opinion that an allowance of $30 a month for the appellee and the child is fair.

The judgment dismissing the petition seeking the annulment of the marriage is affirmed. The order awarding maintenance is reversed for proceedings consistent with the view expressed in relation to it.